[Crim. No. 12038. In Bank. Mar. 18, 1974.]

In re JOSEPH ROSOTO et al on Habeas Corpus.

[Crim. No. 7490. In Bank. Mar. 18, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH ROSOTO, JOHN FRANK VLAHOVICH and
DONALD GLEN FRANKLIN, Defendants and Appellants.

COUNSEL

Paul M. Posner, under appointment by the Supreme Court, for Petitioners.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, Herbert L. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Respondent.

OPINION

**THE COURT.**—Petitioners, Joseph Rosoto, John Frank Vlahovich, and Donald Glen Franklin, were convicted of murder in the first degree and of several additional crimes.[1] We affirmed the judgments imposing the death penalty in *People* v. *Rosoto* (1962) 58 Cal.2d 304 [23 Cal.Rptr. 779, 373 P.2d 867]. Petitioners subsequently sought by writ of habeas corpus to set aside the judgments claiming that a key prosecution witness, Michael Rosoto (Michael), the half-brother of Joseph Rosoto, committed perjury and that the prosecuting authorities were aware of the perjury. We appointed a referee who found, after a lengthy reference, that Michael had not perjured himself. We adopted the referee's findings but because of errors in the penalty proceedings issued the writ, recalled the remittitur, reversed the judgments insofar as they related to the death penalty and affirmed in all other respects. (*People* v. *Rosoto* (1965) 62 Cal.2d 684 [43 Cal. Rptr. 828, 401 P.2d 220].) Upon stipulations of petitioners, their counsel, and the Attorney General, acting in the place and stead of the District Attorney of Orange County, petitioners were subsequently sentenced to life imprisonment.

Petitioners now claim in their current application for the writs of habeas corpus and *coram vobis* that the prosecution suppressed evidence at their guilt trial, that new evidence has been discovered by them undermining the prosecution's case, that there was perjury at their trial and at the

---

[1] Rosoto was found guilty of (1) murder in the first degree for killing Leslie Simpson, (2) conspiring with Michael Rosoto and three others, to commit burglary and robbery of the South Seas bar in Anaheim, California, (3) burglary of the South Seas bar, (4) kidnaping with intent to commit robbery (two counts), (5) perjury, and (6) conspiracy to obstruct and pervert justice by delaying, impeding and avoiding criminal proceedings instituted against him for the robbery. Defendant John Frank Vlahovich was found guilty of (1) murder in the first degree for killing Leslie Simpson, (2) perjury, and (3) conspiracy to obstruct justice. Defendant Donald Glen Franklin was found guilty of (1) murder in the first degree for killing Leslie Simpson and (2) conspiracy to obstruct justice.

earlier habeas corpus proceeding and that the prosecution was aware of the perjury. Petitioners also contend that there was a violation of the rules later enunciated in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].[2]

We appointed the Honorable Stanley C. Young, Jr., Judge of the Superior Court, County of Plumas, as referee to hold hearings on the following questions:

"1. What, if any, new evidence undermining the case presented by the prosecution at the trial, has been discovered by petitioners or their counsel since the reference in *People* v. *Rosoto,* 62 Cal.2d 684?

"2. If there is such evidence, when did representatives of the State of California become aware of it?

"3. Did any representative of the State of California commit perjury at the trial of petitioners or at the reference?

"4. What, if any, evidence favorable to the defense or ordered to be produced by the trial court at petitioners' guilt trial was suppressed by the prosecution?"

The referee found in response to question 1 that there was no newly discovered evidence undermining the prosecution's case and accordingly did not answer question 2. He also found in response to question 4 that the prosecution did not suppress any evidence. In response to question 3, however, he found that Frank Oxandaboure, the chief investigator of the district attorney's office, committed perjury at the prior reference. It was specifically found that Oxandaboure perjured himself when he denied (1) that any assurances were given Michael that he would receive immunity if he testified, (2) that he assured Michael he would not go to jail if he testified on behalf of the People, (3) that he assured Michael he could come to Los Angeles County without fear of being arrested by Los Angeles authorities, (4) that there was any discussion with Los Angeles law enforcement agencies there would be no prosecution of Michael if he helped and testified, and (5) that he ever requested of any law enforcement agency in Los Angeles to refrain from bringing Michael to trial for various crimes committed in that county. The referee further found that no other representative of the state committed perjury at the trial or at the earlier reference.[3] We conclude for the reasons which hereinafter appear that petitioners are entitled to no relief.

---

[2] A summary of the evidence sustaining the guilty verdicts at petitioners' trial is found in *People* v. *Rosoto, supra,* 58 Cal.2d 304, 320-324.

[3] Additional findings made by the referee, not responsive to the questions submitted, are not discussed.

*Asserted Newly Discovered and Suppressed Evidence*

In pretrial proceedings on the substantive charges the court had ordered the prosecution to produce statements, recordings and notes of the defendants and recordings and signed statements of the material witnesses. Pursuant to the order the district attorney had made available to two defense counsel a number of files, tape recordings and transcripts of recordings. The files included hundreds of reports, and there were from 30 to 40 tape recordings.

Mrs. Delores Smith, a secretary in the district attorney's office, was present during defense counsels' inspection of the documents and recordings. Although on a few occasions she gave a specific report or tape to counsel upon his request therefor, she would generally merely provide the next file in order when counsel was ready for it. When counsel finished his examination of a particular item he would either place it on a table or return it to Mrs. Smith. She made pencil notations on documents which she observed counsel read. No notations were made on documents which counsel may have superficially examined or looked at but did not appear to read. She operated the reproducing equipment and played several tapes for counsel. She made notations as to the particular tapes played. On one occasion counsel made copies of documents and Mrs. Smith made notations on the back of the documents so copied.

The first item which is claimed to be newly discovered evidence is a letter from the Seattle Police Department to the Orange County authorities dated October 6, 1959. According to the letter, Michael had said that he understood that the triggerman was a man from New York, apparently a reference to a man named Suboter.

One of the defense counsel testified at the hearing on the instant reference that he did not see the letter or a copy thereof until after trial had been completed and judgments affirmed. Although the other defense counsel had told attorneys on occasions prior to the reference that he had not seen the letter, he testified at the hearing that he believed he had seen the report by the time of trial because he remembered a reference to the man from New York. The letter was not notated by Mrs. Smith.

The second, third and fourth items claimed to be newly discovered relate to an interview on November 29, 1959, of Michael by Seattle and Orange County officials. In this interview Michael said petitioners had referred to another triggerman other than Suboter. The first of the three items is a City of Anaheim police report summary of the interview, the second is a transcript of the interview, and the third is a tape recording

of the interview. The tape recording no longer exists because, according to a police officer, the tape was erased in 1961 or 1962.

The first defense counsel stated that he did not see the report or the transcript. The second defense counsel also said he had no independent recollection of seeing the report or the transcript, although he did have a vague recollection of a name of a person mentioned during the interview. A draft of the transcript contains a notation by Mrs. Smith that the second counsel had read the transcript and played the tape. The City of Anaheim police report also contained a notation by Mrs. Smith to the effect that it had been read by the second counsel.

A fifth item of claimed newly discovered evidence refers to tape recordings of an interview of Michael on February 4, 1960, by Frank Oxandaboure, the chief investigator of the district attorney's office, and the prosecuting attorney. This transcript contains the asserted "deal" with Michael which forms the basis of the referee's perjury finding. (See fn. 5, *infra*.)

The first defense counsel denied ever having heard the tapes. When it was indicated that he had used some of the information on the tapes in cross-examining Michael at trial, he claimed that his questions were based on information obtained from tapes of other conversations.

Although the second defense counsel had stated prior to the hearing on the instant reference that he had no recollection of previously having heard the tapes of the interview of Michael, he nevertheless testified at the hearing that he had heard them. Prior to the receipt of his testimony he and others adjourned to the referee's chambers and listened to the tapes in their entirety. He testified that this was the first occasion since the trial that he had heard the whole of the tapes, rather than excerpts, in connection with the fifth item of claimed newly discovered evidence. He testified that once he heard the tapes he recalled having heard them on some prior occasion and that he remembered certain specific matters, including references to Michael's answers as to why he had changed his story from what he had stated in the Seattle interview. Counsel also testified that he had elected not to use the tapes at trial to attempt to establish that Michael had been offered immunity because if such an offer had been made it was conditioned on Michael telling the truth and that such a disclosure might hurt his clients' case.

Mrs. Smith testified that the tape recordings had been made available to defense counsel, and transcripts of the tapes contain notations by Mrs. Smith to the effect that they had been read by defense counsel.

The sixth and final item of claimed newly discovered evidence is a

ballistics transmittal letter from the Anaheim Police Department to the Federal Bureau of Investigation dated June 10, 1959. In the course of the letter, there is attributed to the decedent a statement made seconds before the killing indicating that he recognized his assassin. Petitioners point out that the prosecution's theory was that the triggerman had been brought in from San Francisco, and that such person was unknown to the decedent. Such evidence, it is now claimed, would defeat the prosecution's theory of what took place.[4]

Both defense counsel testified that they had not seen the letter at or prior to trial. According to Mrs. Smith, the letter was of the type of information made available to the defense, but she could not recall specifically whether the content of the letter had been disclosed, and there was no notation on the letter.

■ When the findings of a referee are based in substantial part on the credibility of witnesses, such findings, although not binding on this court, are entitled to great weight in view of the referee's unique opportunity to observe the demeanor of the witnesses when they testified. (*People* v. *Rosoto, supra,* 62 Cal.2d 684, 688-689; *In re Allen* (1956) 47 Cal.2d 55, 57 [301 P.2d 577].) The testimony as to whether defense counsel were permitted to inspect the first five items of claimed newly discovered and suppressed evidence was sharply conflicting. ■ We are persuaded that Mrs. Smith's testimony, her notations and the testimony of the second defense counsel provide a firm foundation for the findings of the referee as to these items. In light of the large number of documents and recordings made available to counsel, it is understandable that the first defense counsel would, many years after the inspection, be unable to recall some of such materials. Although neither counsel recalled the sixth item, the June 10 letter, it was merely a letter of transmittal and not the kind of document with which counsel would ordinarily be concerned. When considered in the light of the vast amount of materials made available to counsel their inability to recollect a particular letter does not establish that it was suppressed or that it now must be deemed as newly discovered. We adopt the findings of the referee that there is no newly discovered evidence and that the prosecutor suppressed no evidence.

---

[4]The statement in the letter is that decedent said: "Oh, it is you. Get out of here." At the trial and at the instant hearing, the evidence was that decedent said: "Go on, get out of here" or "Oh, get out of here." Decedent's widow was the one who overheard the statement.

*Asserted Perjury*

At the hearing on the prior reference in 1964 Frank Oxandaboure was questioned about discussions he had with Los Angeles authorities relative to crimes committed by Michael. In the course of his testimony the following appears: "Q. And was there any discussion of this particular matter, whereby there was any promise made that there would be no prosecution of Mike Rosoto if he helped you and testified? A. No sir. Q. Were there any assurances given to Michael Rosoto by you or anyone that Michael Rosoto would receive immunity if he testified? A. I did not give him any. I know of no one else who did."

At that hearing Oxandaboure also denied that there were any conversations with Los Angeles law enforcement agencies in which a promise was made that there would be no prosecution of Michael if he helped with the investigation and testified at the trial. Oxandaboure also denied that he ever requested any law enforcement agency in Los Angeles County to refrain from bringing Michael to trial in Los Angeles County, that he threatened Michael with prosecution for the South Seas robbery if he did not testify at the murder trial or at the hearing on the 1964 reference, and that he never assured Michael that he could testify in "this trial" without fear of arrest by the Los Angeles authorities.

On February 4, 1960, Michael was interviewed by Oxandaboure, the prosecuting attorney, and two police officers. The interview was taped and the pertinent portions are set out in the margin.[5]

---

[5] "[Oxandaboure]: And one other thing, the big question they're gonna ask you, is no matter *who* it might be, it's in my mind and I've asked you a hundred times is, why does Mike Rosoto tell us on his brother? Now, I've never had a good explanation to that and that's one of the questions I wanna ask you. In other words, who does Mike, who, at one time, loved and would do anything for Joe Rosoto, why does he now, at this point, ah, want to tell about a murder that Joe had committed? [Michael]: Well, not only about the murder. Well, let's just put it this way. Let's just say that, ah . . . now last year, I've changed, ah . . . . [Oxandaboure]: Yeah, I am sending the officers up there, you've had jobs, and you've done the . . . [Michael]: . . . No, I mean, I'll admit to you, I mean . . . I mean . . . ah, just to be . . . I mean, I'm not gonna be prosecuted for things I've done in the past because I feel sure that I trust you people. [Oxandaboure]: Um-hum. [Michael]: You understand what I mean? [Oxandaboure]: Um-hum. [Michael]: I mean, do I get that guarantee for it? [Oxandaboure]: Mike, you get the guarantee that you'll not be prosecuted for anything that you've done in the past or . . . when, or . . . as long as you tell us the truth. [Michael]: . . . Okay. [Oxandaboure]: I mean, ah, here's one thing . . . . [Michael]: That's enough . . . that's enough . . . . [Oxandaboure]: All right, that's the truth, but one thing I understood Mike, is that, ah . . . if it's a batch of lies, why, boom, it stops right there. [Michael]: Yeah, that's right. [Oxandaboure]: Because, ah . . . . [Michael]: I don't blame you, cause you're wasting my time and I'm wasting yours. [Oxandaboure]: Yeah, that's right."

In 1957 Michael had been acquitted of a robbery charge in Los Angeles. There were several additional robberies in Los Angeles and Michael did not want to leave Seattle for California because of his fear of prosecution for such additional robberies. In addition Michael had been indicted for the South Seas robbery in Orange County. Before Michael's arrival in Orange County on February 4, 1960, Oxandaboure contacted the Los Angeles authorities and secured their agreement not to arrest and prosecute him while he was in Orange County assisting on the case. The understanding according to Oxandaboure was that the Los Angeles authorities could do what they wished after the trial had been completed.

Michael has never been tried for the South Seas robbery or the six or seven Los Angeles robberies.[6]

Petitioners also claimed that the prosecution was guilty of perjury at the hearing on the first reference. It appears that he testified at the 1964 hearing in the following manner: "Q. Did you promise Michael Rosoto he wouldn't go to jail in Los Angeles? A. I don't believe we discussed it . . . I don't think we did. Now maybe I don't know." As noted, the prosecutor was present at the February 4, 1960, interview conducted by Oxandaboure. The claim of perjury is based on the matters set out in the footnote from that interview. The prosecutor did not make any representations of immunity personally; perjury is claimed on the basis of Oxandaboure's statements in the prosecutor's presence.

It is also claimed that Mrs. Smith and another member of the district attorney's staff were guilty of perjury at the hearing on the 1964 reference. They had heard through electronic means a conversation between Rosoto and Vlahovich in a parking lot. The conversation was recorded but the tape presently is in large part incomprehensible. Mrs. Smith prepared a transcript of the conversation based on the tape and her recollection of what was said. In preparing the transcript, she utilized audio filtering equipment at a local radio station and at the Los Angeles Police Department.

Mrs. Smith and the staff member both testified that at one point in the conversation the following occurred: "[Vlahovich]: Boy, he really screwed it up himself. Joe, you were so far away from it and I was so close . . . ah . . . . [Rosoto]: You looked so close. [Vlahovich]: Boy, I got so scared, for two hours I couldn't drink a fucking beer."

---

[6]After the February 4 conversation Michael returned to Seattle and committed a robbery there. He was convicted of this robbery.

The foregoing cannot be heard on the tape. Both Mrs. Smith and the staff member testified that they were able to hear the words loud and clear on the monitor although the portion of the tape involved has a great deal of interference and static. The staff member said that the conversation made a strong impression on him because he knew Rosoto had been in an airplane when the shooting had occurred and this was the first confirmation that Vlahovich, Franklin and Johnson, the alleged triggerman, were at the scene of the murder.

One of defense counsel who had heard the tape prior to trial said he thought he had heard the words as described by Mrs. Smith when he played the tape repeatedly prior to trial.

There was testimony by an expert that the transcription of the tape is inaccurate because it assertedly omits a few words and because it includes some extra words, although the expert could not identify the words on the tapes. It also appears that the sentences quoted above are out of context because the preceding and subsequent sentences deal with Rosoto and Vlahovich being in cells and being transported to court.

■ The testimony of a witness is ordinarily elicited either by general questions seeking a narration of events or a series of specific questions calling for specific answers as to each fact. (3 Wigmore on Evidence (Chadbourne ed. 1970) §§ 766, 767; Witkin, Cal. Evidence (2d ed. 1966) § 1154.) When counsel uses the latter method the witness should respond to the question. He should not evade or volunteer matters not specifically asked for; the nonresponsive answer may be stricken on motion of the questioner who is entitled to elicit testimony in his own way and to confine the scope of the examination as he sees fit. (Witkin, Cal. Evidence, *supra,* § 1165.) The reason for this rule is dramatically illustrated by the defense counsel's testimony that he chose not to present evidence at trial of Oxandaboure's guarantee that Michael would not be prosecuted because the guarantee had been conditioned on Michael telling the truth, and the jury's knowledge of the condition might be harmful. Counsel's trial strategy would have been defeated if Oxandaboure or Michael, although not asked about a guarantee of immunity, had nevertheless been permitted to volunteer it.

■ It is thus apparent that when, as here, a witness' answers are literally true he may not be faulted for failing to volunteer more explicit information. Although such testimony may cause a misleading impression due to the failure of counsel to ask more specific questions, the witness' failure to volunteer testimony to avoid the misleading impression does not constitute perjury because the crucial element of falsity is not present in his testimony.

(Cf. *Bronston* v. *United States* (1973) 409 U.S. 352, 357-359 [34 L.Ed. 2d 568, 573-574, 93 S.Ct. 595, 599-600]; *People* v. *Wong Fook Sam* (1905) 146 Cal. 114, 118 [79 P. 848]; *People* v. *Di Giacomo* (1961) 193 Cal.App.2d 688, 692 [14 Cal.Rptr. 574].)

 Insofar as appears from the record before us Oxandaboure's denials at the hearing on the prior reference of guarantees or assurances of immunity were literally true. The questions put to him asked whether he had guaranteed or assured Michael immunity if he testified. The guarantee conversation occurred during investigation before charges were brought against petitioners, and the guarantee of immunity was conditioned not on merely testifying but on telling the truth. Oxandaboure was not required to volunteer testimony as to a guarantee other than the one of which he was asked, and although his answers to the questions asked may have left a misleading impression that not even a conditional guarantee was made, he was never asked whether a conditional guarantee of any kind was made.

Similarly, the record fails to show falsity of Oxandaboure's denials of arrangements with Los Angeles law enforcement authorities to give Michael immunity. There is no direct evidence of such arrangements. We are satisfied that reasonably construed the record shows only that Oxandaboure secured from the Los Angeles authorities promises not to arrest or prosecute while Michael was in Orange County cooperating with the officials of that county. Although the record shows that Michael was not prosecuted in Los Angeles County subsequent to his acquittal of the 1957 robbery charge, it further appears that the Los Angeles officials had made no efforts to bring him to trial on the outstanding charges during the period of more than a year before Oxandaboure's activities. In these circumstances the lack of prosecution appears to be due to independent reasons and does not furnish a basis for implying an agreement granting immunity arranged by Oxandaboure with the Los Angeles authorities.

Finally, there is no evidence that Oxandaboure made assurances to Michael with respect to the latter's testimony at the hearing on the first reference.

Although great weight is accorded findings of a referee based in substantial part on the credibility of witnesses, the referee's findings of perjury by Oxandaboure are not based in the main on the credibility of witnesses. They are primarily based on documentary proof and inferences drawn from undisputed facts. In such circumstances we are at no disadvantage in examining the record and making conclusionary findings. For the reasons stated we conclude that petitioners have failed to establish that Oxandaboure is guilty of perjury in any of the instances charged.

■ Although the prosecuting attorney at the first reference originally stated that there was no discussion of a promise that Michael would not go to jail in Los Angeles, he immediately corrected the answer: "I don't think we did. Now maybe I don't know." The record does not warrant a conclusion that the equivocal answer constitutes perjury. The only discussion relating to a promise of immunity occurred on February 4, 1960, and more than four years elapsed before the prosecutor testified. It does not appear that the content of the discussion had been called to his attention in the intervening period, and there is no substantial reason to doubt the truthfulness of his ultimate answer that he did not recall such discussion although it may have occurred.

Petitioners claim that Mrs. Smith and the staff member perjured themselves on the basis of the testimony of the expert that Mrs. Smith's transcription of the parking lot conversation omits some words from and includes others not present on the tape recording. The expert did not dispute that the portion of the tape involved could not now be deciphered. Since defense counsel said he believed he heard the words testified to by Mrs. Smith and the staff member, the testimony does not furnish a basis for concluding they committed perjury.

We conclude accordingly, that petitioners have not met their burden of proving that any representative of the state committed perjury at the trial or the hearing on the first reference.

### Asserted Bruton Error

Extrajudicial statements of each defendant were received at trial over objections of the nonconfessing defendants. In each instance the purported declarant took the witness stand to deny having made the extrajudicial statement.

*Bruton* v. *United States, supra,* 391 U.S. 123, holds "that it is a denial of the right to cross-examination, guaranteed to a defendant in a criminal case by the confrontation clause of the Sixth Amendment, to admit at a joint trial an extrajudicial confession of a codefendant which implicates the defendant, despite instructions to the jury to disregard the confession as evidence against the nonconfessing defendant." (*In re Hill* (1969) 71 Cal. 2d 997, 1008 [80 Cal.Rptr. 537, 458 P.2d 449].) We held in *Hill* that until "such time as the Supreme Court affirmatively indicates that cross-examination of the confessing codefendant at trial is adequate under the confrontation clause, we feel compelled to hold that the admission of his confession is constitutional error of the type condemned by *Bruton*." (*Id.* at p. 1013.) ■ The United States Supreme Court subsequently held that

when the confessing codefendant takes the stand in his own defense, denies making the alleged out-of-court statement and testifies favorably to the defendant, there has been no denial of the defendant's rights protected by the Sixth and Fourteenth Amendments. (*Nelson* v. *O'Neil* (1971) 402 U.S. 622, 629-630 [29 L.Ed.2d 222, 228-229, 91 S.Ct. 1723].) The same rule applies when the codefendant testifies and affirms his out-of-court statement. (*People* v. *Sosa* (1972) 26 Cal.App.3d 514, 518 [103 Cal.Rptr. 58].)

Rosoto and Vlahovich seek to distinguish *Nelson* on the ground that they had joint counsel who could not effectively cross-examine his clients. But each fails to suggest anything favorable to him which further cross-examination might have produced, and we may not presume that counsel did not exercise due diligence on behalf of each of his clients.

The order to show cause is discharged, and the petition for writ of habeas corpus and for writ of *coram vobis* is denied.

Mosk, J., and Clark, J., did not participate therein.

Petitioner's application for a rehearing was denied April 17, 1974. Mosk, J., did not participate therein.