[Crim. No. 27706. Second Dist., Div. Four. Mar. 24, 1977.]

In re JULIUS B., a Person Coming Under the Juvenile Court Law.
CLARENCE E. CABELL, as Acting Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
JULIUS B., Defendant and Appellant.

COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JEFFERSON (Bernard), J.**—In a petition filed by the Probation Department of Los Angeles County, Julius B., a 17-year-old minor, was accused in paragraph I of the murder of Roy Crutchfield, in violation of Penal Code section 187, and in paragraph II of an assault with a deadly weapon upon Kenneth Abrone, in violation of Penal Code section 245, subdivision (a). The allegations were denied. During the trial in the juvenile court the petition was amended to add paragraph III, charging that Julius B. had committed an assault with a deadly weapon upon Andre Halloway, in violation of Penal Code section 245, subdivision (a).

Paragraphs I and III of the petition were found to be true. Paragraph II was found not to be true. The minor was declared a ward of the juvenile court, pursuant to Welfare and Institutions Code section 602, and committed to the California Youth Authority. He appeals.

There is little dispute concerning the events which gave rise to the offenses charged. On Sunday, August 18, 1974, about 9 p.m., a number of teenagers and young men were standing at and around a liquor store parking lot at 42d Place and South Hoover in Los Angeles. Among them were Teddie, Patrick, Andre Halloway, the victim of an assault with a deadly weapon, Joe, Tyrone, Kenny, Terence, Brenice, and the murder victim, Roy Crutchfield.

A dark-colored Chevrolet drove past with several occupants. Some hands came out of the car windows, making the sign of the "Crips," a gang. A bottle or bottles struck the car. It proceeded down the street, slowing down at a corner, and two occupants got out of the car and came

running back to the parking lot. The group on the corner was asked by the visitors about the bottles and, also, if anyone present was a member of the "Brims," another gang. One of the occupants from the Chevrolet grabbed the jacket of Joe and asked him what was written on his shirt.

Kenny, Brenice and Roy Crutchfield came walking across the street. Reference was made by the two visitors to the "Crips." Kenny responded that he cared nothing about gangs, and proceeded toward the liquor store. There was laughter.

At this point one of the occupants who had emerged from the Chevrolet pulled a gun from his waistband and fired a shot in the direction of Kenny, who by this time was entering the liquor store. The shot went through the liquor store window. Roy Crutchfield fell to the ground as another shot was fired (or possibly a third). He was fatally wounded, with a bullet in his head.

The Chevrolet automobile had returned, and departed in a northerly direction on Hoover; the two former occupants of the automobile ran off in that direction.

The major dispute at the trial centered around the identity of the assailants. Teddie, Patrick and Andre, none of whom had ever seen the two before, identified the minor, Julius B., as the triggerman, although none of them had been able to identify him by photograph. There were variations in their testimony but it appeared that the taller of the two, who was the one that shot Crutchfield, was nearly six feet tall, a light-skinned Negro youth, wearing a natural hair-do, parted in the middle, a dark jacket and dark pants, probably levis. The shorter youth from the automobile was an older Negro youth with darker skin, short hair, and was wearing khaki pants and a dark jacket. One of the jackets worn was a "bomber" jacket, and had a fur collar.

The minor, Julius, offered the defense of alibi. He claimed that he was at home with his family at the time of the incident. He introduced testimony that, along with Calvin D. and Brigetta M. and a young adult, Mack Thomas,[1] he had been in a dark-colored Chevrolet which belonged to his friend, Calvin, on Friday, August 16, 1974, but that on the following Sunday he had not been in the company of these friends.

---

[1]Mack Thomas was in the adult court at the time these juvenile proceedings were in progress, being tried for the same murder—that of Roy Crutchfield.

The prosecution called investigating officer Richard Knott to the witness stand. Some questions were asked concerning his investigation. Upon cross-examination, defense counsel elicited from the witness that he had received word from an unidentified female informant after the shooting that Brenice could provide some information about the identity of the Crutchfield assailants. The court interrupted at this point with the observation that hearsay was being introduced. However, defense counsel continued to question Knott about what had been told to him, and by whom, about the shooting. The prosecutor made a motion to strike the testimony, on the ground that it was not relevant. The trial court overruled the motion. The prosecution pointed out that at this stage of the trial there had been no testimony from Brenice, and that testimony concerning what he might have told Officer Knott was "premature." Defense counsel was asked to make an offer of proof and indicate relevancy. The reply was: "[Defense counsel]: I am not going to the statements made by Brenice . . . . I am providing to—there is two objects of the testimony that I am driving at. [¶] One is the relationship of the money that has been brought up of other witnesses and two is my ongoing 405 motion to the relationship to identification and preliminary foundation that they were independent. [¶] THE COURT: Well, you go ahead."

Later, during cross-examination by defense counsel, Knott narrated how Brenice and another person had been encountered by him on the street, and had advised him to investigate a certain Mack Thomas (known as "Mad Dog") and his brother Lee, as persons involved in the shooting. Without objection, the witness told how Brenice later identified Mack Thomas, by photograph, as one of the assailants.

Defense counsel continued to cross-examine, eliciting from the police officer, Knott, that Mack Thomas had been arrested in October of 1974, and had given Knott the information which had led to the arrest of the minor, Julius B. "[Defense counsel]: Did Mack Thomas give you information that led you to [minor]? [¶] [Witness Knott]: That is correct."

Later in the trial, defense counsel continued to pursue the matter of Mack Thomas with Knott's partner in the investigation, Officer Richard Ortiz. Ortiz had been present on occasions when Mack Thomas was being interrogated. "[Defense counsel]: *What did Mack Thomas tell you about this incident?* [¶] [Witness Ortiz]: He stated that he was there in a car when this shooting took place along with Bregetta M . . . , Calvin D . . . and another individual and he stated that it was Calvin's car that they

were in. [¶] THE COURT: Another individual? Did he name the other individual? [¶] THE WITNESS: No, he did not. He gave us some information about this third individual. He told us that he went to school in Compton and he lived on the same street as Bregetta, but he did not know the address. [¶] [Defense counsel]: Did he know the name of the other individuals? [¶] [The witness]: No, he did not. I believe he mentioned the name, 'Jay,' but that was all. He did not know the particular name. . . . [¶] [Defense counsel]: *What did he tell you?* [¶] [The witness]: He stated that the other guy in the car did the shooting, that he merely was an observer. He did not participate in the shooting himself." (Italics added.)

Later, Ortiz was asked to divulge the contents of a subsequent interview he had with Mack Thomas. "[Defense counsel]: *Did you ask him whether he* saw Jay do the shooting? [¶] [The witness]: To the best of my recollection, I believe he stated that he had seen what appeared to be gun flashes coming from the hand of this individual he referred to as Jay." (Italics added.)

On redirect examination by the prosecutor, without objection from defense counsel, Ortiz was allowed to relate how Mack Thomas had identified "Jay" as the minor, Julius B., by selecting a photograph of him contained in the Compton High School Yearbook for 1973.

At the time of the examination of Officers Knott and Ortiz by defense counsel, Mack Thomas had not been called as a witness in the case. Defense counsel made a motion to strike the testimony of Ortiz relating the statements made by Mack Thomas on the ground that the officer's testimony about what Thomas had told him was inadmissible because Mack Thomas was "unavailable" as a witness. The motion was denied by the court as follows: "THE COURT: All I know is, you asked the questions. If there is no objection to them, they come in. That's all."

Mack Thomas was then called as a witness and appeared with his counsel, a deputy public defender. He refused to answer questions posed by defense counsel on the grounds that the answers thereto might incriminate him.

Later, Officer Knott reappeared on the witness stand. He was asked by the prosecutor if Mack Thomas had identified "another individual" at the shooting scene. Defense counsel objected: "[Defense counsel]: I believe there's a possibility of an Aranda problem here. We do have a co-defendant. We have statements of a co-defendant. [¶] THE COURT:

Well, how could there be an Aranda problem when this entire matter was already thoroughly discussed without present objection. As a matter of fact, not without objection, but was brought to the court's attention by the minor's attorney. You can't pick and choose, can you?"

Counsel went on to explain that he had been pursuing the previous line of questioning the officers about statements made by Mack Thomas because of the issue of "probable cause." The trial court replied that no limitation had been imposed upon the evidence which had been elicited. After some colloquy between court and counsel, the court remarked: "It seems obvious, if it were brought in for the truth of the statement, that it would probably have been one of the *most unwisest defense choices to ever make . . . .*" (Italics added.)

The trial court explained that he tried to let lawyers do what they felt was strategically best for their clients, without sitting in judgment. After considerable additional argument by the defense and the prosecution, the trial court ruled that the prosecution could now explore anew with Officer Knott information he assertedly had received from Mack Thomas. Knott proceeded, through the words of Thomas, to place the minor, Julius B., unequivocally at the scene of the killing as the triggerman.

■ We commence our discussion with the observation that a minor is entitled to representation by counsel in an adjudicatory (jurisdictional) hearing such as the one under review here. The right to counsel is part of that body of rights afforded to minors which assures that "fundamental fairness" is observed in proceedings held to determine whether or not criminal conduct has been engaged in by the minor. (*In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *In re William F.* (1974) 11 Cal.3d 249, 254 [113 Cal.Rptr. 170, 520 P.2d 986]. See also *In re Damon C.* (1976) 16 Cal.3d 493 [128 Cal.Rptr. 172, 546 P.2d 676].)

Since the right to counsel is required for fundamental fairness, it seems reasonable that such counsel should be required to be "effective counsel," i.e., counsel " 'reasonably likely to render, *and rendering* reasonably effective assistance.' [Citations.]" (*In re Saunders* (1970) 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921].) (Italics in original.)

■ As has been observed on many past occasions, the ineffectiveness of counsel which arguably introduces the grave issue of constitutional

error into a trial must be demonstrated with particularity on appellate review; the inadequacy complained of must be of substantial proportion. The trial must, because of counsel's inadequacy, have been reduced to a "farce or a sham." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Reeves* (1966) 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35].) An *errorless* trial is not the standard (*In re Saunders, supra,* 2 Cal.3d 1033, at p. 1041), and an unfortunate choice of trial strategy has been held, on occasion, not to constitute the type of inadequacy necessitating reversal. As *People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64] so cogently stated: "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions *cannot be explained on the basis of any knowledgeable choice of tactics.*" (Italics added.)

Both the minor's appellate counsel and the Attorney General have referred to these general principles. The Attorney General argues that defense counsel's elicitation of hearsay was a "clever" trial tactic, and thus falls outside the ambit of the principle of constitutionally inadequate representation, while the minor's counsel concludes that there is simply no reasonable explanation of trial counsel's conduct other than that of inadequacy. The Attorney General bases the tactic argument on the ground that defense counsel was seeking to establish the contrast between the minor, a politically active participant at his high school, and the source of information about his alleged criminality, the leader of a local gang. Appellate counsel for the minor correctly points out that the contrast had already been established on direct examination of the minor, and that the elicitation of inadmissible and highly prejudicial hearsay was not only lethal to the defense, but totally unnecessary.

Appellate counsel refer us to two decisions of the Court of Appeal, *People* v. *Williams* (1971) 22 Cal.App.3d 34 [99 Cal.Rptr. 103] and *People* v. *Dorsey* (1975) 46 Cal.App.3d 706 [120 Cal.Rptr. 508], which hold that when counsel fails to object to the admission of legally inadmissible and harmful evidence, constitutionally inadequate representation may result. The Attorney General argues further that the record shows overwhelming guilt, and thus, any error was nonprejudicial. We reject this argument of the Attorney General.

■ In the case at bench, defense counsel singlehandedly, repeatedly and continuously—despite the comment of the trial judge, the openly

expressed astonishment of the prosecutor, and even the opinion of a lay witness, Knott, that he was being allowed to relate "hearsay"—elicited from prosecution witnesses evidence the prosecution never could have introduced, i.e., the extrajudicial statements of Mack Thomas, accusing the minor of murder.

We can find nothing to explain defense counsel's conduct on the basis that there was a knowledgeable choice of tactics being made by him. It is hornbook law, and should be known by any attorney—experienced or fledgling—that the extrajudicial statements of Mack Thomas that accused the minor of murder, made to Officers Knott and Ortiz, constitute inadmissible hearsay if offered against the minor in an adjudicatory hearing in the juvenile court. (See Evid. Code, § 1200.) It is equally hornbook law that hearsay statements such as those made by Mack Thomas fall within no recognized exception to the hearsay rule.

The underlying policy of excluding hearsay testimony that does not satisfy the requirements of some hearsay exception, is that fundamental fairness rejects the notion that determinations of fact can be made upon untrustworthy evidence. In the case of a person accused of crime, the policy is expressed in terms of the right of such person to confront accusers, a right guaranteed by the Sixth Amendment to the United States Constitution and by the California Constitution as well. (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) Any inroads made upon the confrontation guarantee have involved situations where the hearsay declarant was a codefendant who testified and thus became available to the accused for cross-examination. (See *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723]; *In re Rosoto* (1974) 10 Cal.3d 939 [112 Cal.Rptr. 641, 519 P.2d 1065, 69 A.L.R.3d 980], cert den., 419 U.S. 897 [42 L.Ed.2d 141, 95 S.Ct. 177]. See also *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].)

In the case at bench, the minor had no chance to cross-examine Mack Thomas about his statements to the police—statements that were not against Thomas' penal interest, but rather, against the minor's penal interest. The fact that the situation in which the minor found himself resulted from the conduct of his own counsel does not negate but, instead, contributes to the view that his trial was reduced to a "farce or a sham." Put another way, the minor's counsel "did not effectively supply to [the minor] those skills and legal knowledge which we can reasonably

expect from any member of the bar." (*People* v. *Cook* (1975) 13 Cal.3d 663, 672-673 [119 Cal.Rptr. 500, 532 P.2d 148].)

■ We are aware that, in juvenile court proceedings, the rules regarding the admission of what would otherwise be incompetent evidence are not as clearcut as they are in adult criminal proceedings. The case of *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], tells us that a minor has the right to have the determination of his criminal conduct made on the beyond-a-reasonable-doubt burden-of-proof standard. In the case of *In re Michael V.* (1974) 10 Cal.3d 676 [111 Cal.Rptr. 681, 517 P.2d 1145], the California Supreme Court was called upon to interpret the language contained in Welfare and Institutions Code section 701, as it read before being amended in 1976. It provided, in pertinent part, that in juvenile court proceedings, *"any matter or information relevant and material to the circumstances or acts* which are alleged to bring him [the minor] within the jurisdiction of the juvenile court *is admissible* and may be received in evidence; however, proof beyond a reasonable doubt supported by evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602, . . ."[2] (Italics added.)

Describing section 701, the California Supreme Court observed that it was a "unique provision," allowing "incompetent evidence to be admitted but preventing it from being used to support a judgment, [it] was apparently designed to preserve the informality of the juvenile court proceeding by eliminating the necessity of objecting to the introduction of incompetent evidence. Thus, when the state introduces incompetent evidence, the juvenile court does have a duty to exclude consideration of it as a ground for its jurisdictional judgment, and it must do this on its own motion. Section 701, however, does not alter the doctrine of invited error. When a minor introduces incompetent evidence, in order to avoid estoppel on the basis of invited error he must specify any portions of that evidence he does not desire to be used in support of the judgment. Thus, when the minor introduces an out-of-court statement without seeking to limit its use or to bring the declarant into court for examination, he is

---

[2]In 1976, section 701 was amended to strike therefrom the language: "any matter or information relevant and material to the circumstances or acts which are alleged to bring him within the jurisdiction of the juvenile court is admissible and may be received in evidence," and to substitute therefore the following language: "The admission and exclusion of evidence shall be pursuant to the rules of evidence established by the Evidence Code and by judicial decision." (Stats. 1976, ch. 1068, § 48, p. 4492; Stats. 1976, ch. 1071, § 27, p. 4525.)

estopped to assert that reliance on such evidence by the juvenile court denies him any right of confrontation." (*In re Michael V., supra,* 10 Cal.3d 676, at pp. 684-685.)

The evidence offered at the adjudication hearing in *Michael V.* consisted of a probation report offered by the prosecution, and a police report offered by the minor's attorney. With respect to the probation report, the court commented that "the probation officer . . . was present at the hearing and could have been subjected to cross-examination regarding the assertions in his report." (*In re Michael V., supra,* 10 Cal.3d 676, at p. 683.) As indicated above, employing the language of noncriminal proceedings, the minor was held "estopped" by the "invited error" of his counsel, with respect to the police report. The language employed reflects the traditional view that juvenile court proceedings more nearly fulfill their purpose when the ordinary adversary rules of adult criminal proceedings are either not applied, or are applied in a more flexible manner.[3]

It is significant that, although Welfare and Institutions Code section 701 makes admissible for some purposes evidence that would otherwise be inadmissible because of the exclusionary rules of evidence, it requires that "[p]roof beyond a reasonable doubt supported by *evidence, legally admissible in the trial of criminal cases,* must be adduced to support a finding that the minor is a person described by Section 602, . . ." (Italics added.) The case of *In re Michael V., supra,* that interprets section 701, seems to us to be distinguishable from the case at bench, in that the declarant probation officer in *Michael V. could* have been confronted by the minor, whereas in our case the minor did not have that opportunity; the single mistake of counsel, if it was one, in introducing into evidence the hearsay police report was not, under the circumstances set forth in *Michael V.,* of such consequence that the mistake reduced the hearing to a "farce or a sham." As stated in *People* v. *Steger* (1976) 16 Cal.3d 539, 551-552 [128 Cal.Rptr. 161, 546 P.2d 665], "[g]enerally, a single lapse of skill will not be held to have resulted in denial of a fair trial."

In the case at bench, however, there was no single lapse of skill, but rather an extraordinary misunderstanding of the nature of an adversary

---

[3]For a discussion of the traditional approach to the juvenile justice system on the federal level, see *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528 [29 L.Ed.2d 647, 91 S.Ct. 1976], where the majority of the United States Supreme Court held that the Sixth Amendment to the United States Constitution did not compel jury trials for juveniles accused of crime.

proceeding. Regardless of how noncriminal juvenile proceedings are perceived to be, *this* minor was charged with a homicide and, as a result, was committed to the California Youth Authority; there can be no doubt that the proceeding was adversary in every sense of the word. Although the Probation Officer of Los Angeles County was the petitioner, he was represented by a deputy district attorney whose function was to seek to convince the trier of fact—the juvenile court judge—beyond a reasonable doubt, that the minor, Julius B., had committed the crime of murder, a violation of our criminal law.

The advocate for the minor in such a. proceeding simply does not undertake the representation of the other side of the dispute. In an adult criminal trial, defense counsel does not assist the state, represented by a deputy district attorney as prosecutor, in securing a determination of his client's guilt. Similarly, in an adversary juvenile court proceeding, defense counsel cannot be permitted to assist the petitioner, represented by a deputy district attorney as prosecutor, in securing a determination that his minor client committed a criminal offense.

Since the minor was deprived of his constitutionally protected right to effective counsel, resulting in the admission against him of substantial and manifestly prejudicial hearsay testimony, the orders sustaining the petition and committing the minor to the Youth Authority cannot stand.

The orders appealed from are reversed.

Files, P. J., and Kingsley, J., concurred.