[No. B017578. Second Dist., Div. Five. Jan. 12, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS MANUEL BECERRA et al., Defendants and Appellants.

**Counsel**

Tibor I. Toczauer and Michael D. Fazio, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and Andrew D. Amerson, Deputy Attorney General, for Plaintiff and Respondent.

**Opinion**

**FEINERMAN, P. J.**—Defendants, Carlos Manuel Becerra and Robert Mario Gutierrez, were convicted by a jury of two counts of robbery. (Pen. Code, § 211.) In addition, Becerra was convicted of possession of heroin. (Health & Saf. Code, § 11350, subd. (a).) Both defendants were sentenced to state prison for five years, the high base term on the robbery charged in count I. They both received a concurrent low base term of two years on the

robbery charged in count II. Becerra also received a concurrent 16-month low base sentence on count III, the heroin conviction. Each defendant received appropriate custody and conduct credits. We affirm the judgment as to both defendants.

BACKGROUND

Antonio Guerra (Guerra) and Alicia Moreno (Moreno) left a Safeway market, at Brooklyn and Rowan, together at about 9:50 p.m. on August 27, 1984. They walked to Guerra's Cadillac which was on the parking lot. Guerra unlocked the doors and helped Moreno into the right front passenger seat. He then put his groceries into the back seat and walked around to the driver's side. As he got into the driver's seat, two men approached the car. One got into the back seat and pointed a gun at Moreno. The other stood at the open driver's door, placed a gun in Guerra's ribs and demanded money. Guerra gave three $20 bills and a number of $1 bills to the man in the back seat. Moreno gave him a $10 bill and some $1 bills. Guerra thought the guns were real. Moreno was very frightened by the guns. Neither Guerra nor Moreno got a good look at the robbers and neither could identify them. Moreno did get to see the clothing worn by the man in the back seat. She identified a cap (People's exhibit 2) and jacket (People's exhibit 3) as being the same as those worn by the man in the back seat. Moreno estimated that the incident lasted about five minutes.

Los Angeles Sheriff's Deputy McClean (McClean) was on patrol at about 9:55 p.m. on August 27, 1984, about a block from the Safeway market, when he was stopped by a citizen who told him that an elderly couple in a "beige over brown" Cadillac were being robbed in the Safeway lot by two Mexicans. As a result of this conversation, the deputy drove into the Safeway parking lot where he observed defendant Gutierrez standing beside Guerra's car pointing a gun at the driver. Gutierrez saw the deputy and started to walk away. McClean told him to freeze. Gutierrez continued walking and threw the gun under a parked van. Gutierrez was stopped and arrested. The gun was retrieved. It turned out to be a toy pistol.

McClean also saw a man seated in the back seat of Guerra's car when he entered the parking lot. He lost sight of the man in the back seat when his attention focused on Gutierrez. Immediately after Gutierrez was handcuffed, Guerra and Moreno came over to the deputy and told him that the man in the back seat had also participated in the robbery.

Anthony Delgado (Delgado) lived on Rowan, about six or seven houses south of the subject Safeway market. He was awakened by the sound of his dogs barking about 10 p.m. on August 27, 1984. Delgado looked out his front

window and saw defendant Becerra walking out of his yard. Delgado did not know Becerra and Becerra did not have permission to be in Delgado's yard, which was fenced. Delgado walked out onto his porch and observed Becerra walk south on Rowan toward Michigan, cross the street and go up on the porch of a house. At about this time, Delgado observed a sheriff's car stop at the corner of Rowan and Michigan. Delgado approached a deputy and described his observations. Becerra was arrested.

Deputies Rendon and Bluntach had been dispatched from the East Los Angeles sheriff's station to Rowan and Michigan at 9:55 p.m. as a result of the robbery. Bluntach spoke to Delgado and accompanied him back to his house. There, they found a cap and jacket (People's exhibits 2 and 3) on Delgado's driveway. They found a toy pistol on the grass in front of Delgado's house. Becerra's mother identified the jacket as Becerra's. She had purchased it for him. She had also seen the cap at her home. Becerra lived at home with his parents. His mother saw him leave the house with Gutierrez around 6 or 7 p.m. on August 27, 1984.

Following his arrest, Becerra was transported to the sheriff's station in the back seat of the patrol car. After Becerra got out of the patrol car, the back seat was searched and a bindle of heroin was found. The back seat of the car had been searched earlier in the evening by Deputy Rendon under Bluntach's supervision. No contraband was there at that time. The car was not left unattended after that and no one other than Becerra had been in the back seat that night. During a booking search, a package containing a handkerchief, a bottle cap, a Q-tip and a hypodermic syringe was found in Becerra's left sock. Upon Becerra's arrest, three $20 bills, one $10 bill and twelve $1 bills were found crunched up in his pants' pocket.

Gutierrez testified in his own behalf. He lived about a mile from the Safeway market. He met Becerra about 7 p.m.[1] They went to a liquor store, then to a market at First and Lorena Streets, then to the residence of a man Gutierrez wanted to hire to fix his car window, but the man was not home. Gutierrez and Becerra then walked down to Brooklyn and Rowan. The two men parted company there, Becerra going north on Rowan and Gutierrez going to the Safeway parking lot to use the phone to call home. There was no answer when he called. He tried calling several times over the next five or ten minutes. He did not notice a robbery taking place on the parking lot.[2]

---

[1]Gutierrez testified that he was watering his lawn when he saw Becerra walking up the street to a liquor store and decided to accompany him. This conflicted with the testimony of Becerra's mother that Gutierrez had come to the Becerra residence looking for Becerra and that the two men had left there together.

[2]Moreno had testified that there was a man in the phone booth while the robbery was in progress and that she had hoped to attract his attention, but that he was oblivious to the robbery.

When he left the phone booth, he was arrested. He denied committing the robbery or having a toy pistol in his pocket. He denied telling Detective Samaniego that he and Becerra had been loitering in the Safeway parking lot begging for money and that they decided to rob someone when they did not get enough through begging. He denied telling Samaniego that he had found a toy pistol a few days earlier and had used it to scare people off.

In rebuttal, the People called Detective Samaniego who testified that Gutierrez was read his *Miranda* rights and waived them. People's exhibit 9 was a card containing the rights. Gutierrez had signed the card and had initialed the waivers.[3] Samaniego further testified that after executing the waiver, Gutierrez told Samaniego that he and Becerra had been loitering at the Safeway parking lot begging money from market patrons. They were dissatisfied with what they got that way and decided to rob someone. Gutierrez said that he had found the toy gun several days before and decided he could use it to get more money. He approached Guerra and asked for money. He saw Becerra in the back seat of the car behind Moreno. When the patrol car came, Becerra jumped out of the car and ran off.[4]

### CONTENTIONS ON APPEAL

■ Becerra's single contention on appeal is that the evidence was insufficient to sustain his robbery convictions. In making this assertion, Becerra focuses on the inability of Guerra and Moreno to identify him and totally ignores Gutierrez's postarrest statement implicating Becerra in the crime. (2) Since Gutierrez testified favorably to Becerra at trial, denied making the incriminating out-of-court statement, and was available for cross-examination, Gutierrez's postarrest statement was fully admissible as a prior inconsistent statement, against Becerra as well as against Gutierrez. (*Nelson* v. *O'Neil* (1971) 402 U.S. 622, 629-630 [29 L.Ed.2d 222, 228, 91 S.Ct. 1723]; *People* v. *Steger* (1976) 16 Cal.3d 539, 551 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *In re Rosoto* (1974) 10 Cal.3d 939, 952 [112 Cal.Rptr. 641, 519 P.2d 1065, 69 A.L.R.3d 980].)

■ Furthermore, the remaining evidence, to wit, Gutierrez's testimony that Becerra was with him until just before the robbery, Becerra's trespass through Delgado's yard just after the robbery, the discarded items of clothing identified by Becerra's mother as his and by Moreno as the same as the robber's, the discarded toy gun in front of Delgado's home, and the fact that Becerra was carrying, crumpled up in his pocket, the same amount and

---

[3]In his testimony, Gutierrez admitted signing the card but denied initialing it. He also denied that he had been read his rights.

[4]According to Gutierrez's statement, Guerra handed his money to Gutierrez. Becerra then grabbed it from Gutierrez as he ran off.

denominations of money as the robber took, constitute such an accumulation of suspicious circumstances as to not only corroborate Gutierrez's extrajudicial statement, but to constitute substantial circumstantial evidence that Becerra was in fact the second robber.

Gutierrez raises two contentions on appeal.  ■  First, he argues that the court erred in refusing to permit him to present a handwriting exemplar to the jury. The issue arose in the following context. After Gutierrez testified on direct examination, a hearing pursuant to Evidence Code section 402 was held outside the presence of the jury. At that hearing, Gutierrez admitted signing the top of the "*Miranda*" card, but denied initialing the waivers.[5] He made no request at that time to present a handwriting exemplar. The statement was ruled admissible; the jury was recalled; and Gutierrez's testimony continued. After cross-examination, Gutierrez's counsel informed the court that he wanted to have Gutierrez execute a handwriting exemplar and put it in evidence. The trial court ruled, pursuant to Evidence Code section 352, that the prejudicial effect of such evidence would outweigh its probative value. The court further informed defense counsel that the court would *not* preclude Gutierrez from calling a handwriting expert to testify with respect to any preexisting handwriting exemplar prepared by Gutierrez under conditions where his handwriting was not under suspicion. Counsel chose not to pursue this alternative. The court did not abuse its discretion under Evidence Code section 352.

■  Gutierrez's second contention is that his counsel was incompetent because he mistakenly believed that the extrajudicial statement would not be admissible for impeachment purposes. We do not believe that the record demonstrates incompetence. Rather, the record establishes that the People's case in chief was airtight, and that at its conclusion, Gutierrez's conviction was all but certain. His counsel made the best of a hopeless situation by calling Gutierrez to testify and then *arguing* that the extrajudicial statement was inadmissible, under authority of *People* v. *Carter* (1957) 48 Cal.2d 737, 753 [312 P.2d 665], because it was not used during the People's case in chief. The facts of the instant case were distinguishable from those in *People* v. *Carter, supra,* and Gutierrez does not now contend that the trial court erred in ruling the statement admissible for impeachment purposes. Nor would such an argument have been successful.

*People* v. *Carter, supra,* 48 Cal.2d 737, did not involve use of the defendant's prior inconsistent statement. A case more closely in point is *People* v. *Thompson* (1980) 27 Cal.3d 303, 330-331 [165 Cal.Rptr. 289, 611 P.2d

[5]Samaniego's testimony established that Gutierrez was fully advised of his rights, that he waived them, and that Gutierrez was the one who initialed the waivers.

883], wherein the court, in dictum, stated that a confession should be offered as part of the People's case-in-chief when there is no reason for not offering it at that time. ■ In the instant case, there was a sound reason for not offering Gutierrez's confession as part of the People's case-in-chief. The case against Gutierrez was very strong. The case against Becerra was considerably weaker. Had the People attempted to introduce the confession before Gutierrez testified, they would have been required to excise all reference to Becerra, pursuant to *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. This would have created a totally misleading picture for the jury with respect to Becerra which would have lent itself to the wholly unwarranted inference that Becerra was not involved in the crime because he was not mentioned in the confession. This was a burden the People should not have had to bear in the absence of any reason to believe that Gutierrez would take the stand and perjure himself. Furthermore, although Gutierrez's plea of not guilty put the People on notice that he would deny his own involvement in the crime, it did not constitute notice that he would provide an alibi for his codefendant. Thus, the People were entitled to use the confession in rebuttal to counter this newly produced and unexpected defense evidence. (*People* v. *Thompson, supra,* 27 Cal.3d at pp. 331-332.)

■ The fact that counsel's strategy below was unsuccessful does not render it incompetent. Rather than counsel's behavior resulting in the withdrawal of a potentially meritorious defense (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), counsel in fact enabled Gutierrez to present a potentially meritorious defense which was not otherwise available to the jury. The fact that the defense could not withstand the scrutiny of cross-examination and rebuttal did not mean that his counsel was ineffective, given the hopelessness of Gutierrez's cause without his testimony.

The judgment is affirmed as to both defendants.

Hastings, J., and Eagleson, J., concurred.