[No. 9161-1-I. Division One. April 26, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. RICHARD GARY WHITE, *Appellant.*

*Cody, Hatch & Bedle, Inc., P.S.*, and *George Cody*, for appellant (appointed counsel for appeal).

*Russ Juckett, Prosecuting Attorney for Snohomish County*, and *Russell Jones, Deputy; Norm Maleng, Prosecuting Attorney for King County*, and *William Fligeltaub, Deputy*, for respondent.

RINGOLD, J.—This is a consolidated appeal from two criminal convictions. Richard Gary White was convicted in Snohomish County Superior Court of one count of perjury in the first degree, and appeals the judgment and sentence entered thereon. White also appeals the judgment and sentence entered upon his conviction in King County Superior Court of one count of theft in the second degree. We reverse both convictions and remand the theft charge for a new trial.

PERJURY CONVICTION

In December 1979, White was charged in Snohomish County by information with two counts of perjury in the first degree in violation of RCW 9A.72.020(1) and one count of making a false representation concerning title in violation of RCW 9.38.020. The trial court, sitting without a jury, found White not guilty on counts 2 and 3 and guilty on count 1, perjury in the first degree.[1]

The perjury charge arose out of White's sworn testimony in a civil case, Violante v. White, Snohomish County cause No. 78-2-02133-4, tried in March 1979. The critical facts in the civil action are set out in the margin.[2]

White contends that the perjury conviction must be reversed because the evidence was insufficient to convict him of the crime charged in the amended information. The original information charged that White

did make a materially false statement, knowing such statement was false, under an oath required or authorized by law, in an official proceeding, to-wit: said Richard G. White testified in Snohomish County Superior Court Cause No. 78-2-02133-4 that he entered into an agreement with James Violante to assume the mortgages on Mr. Violante's house and that no provision was made for paying Mr. Violante for his equity in the house . . .

---

[1]RCW 9A.72.020(1) provides:
"A person is guilty of perjury in the first degree if in any official proceeding he makes a materially false statement which he knows to be false under an oath required or authorized by law."

[2]After preliminary negotiations on June 5, 1978, closing documents for sale of Violante's house to White were prepared by White and executed by the parties on June 7. These included a statutory warranty deed and White's promissory note in the amount of $28,000. White retained the originals of the documents and provided Violante with copies. Although, as the court found, Violante had no present intention of transferring title on June 7, White recorded the deed and took possession of the premises on June 9. White subsequently refused to close the sale or pay rent. Violante brought the action against White in Snohomish County for rent due and for restitution of the property. Following trial the court made findings of fact and conclusions of law, awarded Violante damages in the amount of reasonable rent for the time White was in possession and ruled that title should be quieted in Violante and that a writ of restitution should issue.

The State amended this count at trial to make it more specific:

THE COURT: Now, tell me again, in Count One, you're using the words of line 20, page 112 of the report of proceedings?

MR. GISSBERG: Yes. In substance, line 20 is the equivalent of what's alleged in Count One, but I feel there must be a more particular statement of what we're alleging to be false . . . [T]he specific language would be said Richard G. White testified in Snohomish County Superior Court Cause No. 78–2–02133–4 that there was no provision for equity on page 112 of the report of proceedings.

White was found guilty on this amended count. The trial court, in its findings of fact, stated only

That on or about the 14th day of March, 1979, the defendant, Richard G. White, made a materially false statement, to–wit: At page 112 of the transcript of proceedings, Snohomish County Superior Court, Cause No. 78–2–02133–4, the defendant stated "there was no provisions for equity."

Although this finding does not explain why the statement was false or material, the court's oral decision may be considered in interpreting a finding of fact. *See State v. Eppens*, 30 Wn. App. 119, 126, 633 P.2d 92 (1981); *State v. Mallory*, 69 Wn.2d 532, 419 P.2d 324 (1966). The trial court stated, at the conclusion of trial:

I find that the evidence does prove beyond a reasonable doubt that it was the agreement of the parties that Mr. Violanti [*sic*] was to receive $28,000 for his equity in the property. . . .

I do find the defendant guilty of Count One, perjury, when he stated in the prior proceeding that there was no provision for equity. The testimony of Mr. Violanti [*sic*] was direct and it positively contradicted the later—or the earlier testimony under oath of the defendant in the prior civil proceeding.

At both the civil trial and the perjury trial it was undisputed by White that on or about June 7, 1978, in concluding the purchase of the house, he had signed a promissory note in the amount of $28,000 for the value of Violante's

equity in the property. It is clear that the trial court found that the allegedly perjurious statement "There was no provisions for equity" was false because $28,000 had in fact been provided for equity.

 White did indeed testify at page 112 of the transcript in the civil trial, that "there was no provisions for equity."[3] This testimony, however, which formed the sole

---

[3]The following testimony gave rise to the charge of perjury:

Q When did you first discuss price with Mr. Violante?
A Over the telephone.
Q Was it at that time that he offered you the assumption?
A At that time, he said: "We can probably work something out. Just come and take a look at the house."
Q When did you first get into a discussion of money?
A When I was at the house that afternoon.
Q Who was at the house with you?
A With me?
Q Yes.
A Nobody was with me. Mr. Violante's daughter was there. Mr. Violante was there.
Q So it was just the three of you.
A Just the three of us, correct.
Q Can you tell us how that discussion got started?
A I don't know what was brought up on it. You know.
Q How long did you spend there?
A Probably an hour—an hour and a half.
Q Did you look through the house?
A Looked through the house, yes, sir.
Q When did you start discussing what the price was going to be?
A Sometime during that period of an hour and a half.
Q What was the conversation that you had about the price of the house?
A I explained to him that I was looking for something with a no cash outlay and I wanted something that—just to assume, and he at that time described the fact that there was two mortgages on the house and was that going to create any problem, and I told him—I told him no, that I was interested more in terms than what the payments were—you know, terms meaning the amount of cash to get in.
Q What did he tell you it would cost you to get in?
A He told me that if I could assume the two mortgages, that we could go that route. He was concerned that one mortgage would not be assumable.
Q It's not unusual to assume a mortgage. However, when you're buying a house with a substantial equity, there has to be some provision made for the equity purchase. What was the deal in regard to that?
 MR. ALEXANDER: I will object to the nature of the question.
 THE COURT: Well, I'll let him answer the question.

basis for the criminal charge of perjury in count 1 of the amended information, was given in answer to a question concerning the events of the afternoon of June 5, 1978, 2 days before the promissory note was executed. The mere fact that the note was signed does not, therefore, render White's testimony false when viewed, as it must be, in the context of the question asked. *State v. Olson,* 92 Wn.2d 134, 594 P.2d 1337 (1979).

The requirements of proof in a perjury case are more stringent than those in any other area of law except treason. *Olson,* at 136. Because of the special nature of a perjury charge, pitting as it does the oath of one person against that of another, the proof of falsity must not only satisfy the reasonable doubt standard, but must also meet certain requirements as to form. In order to prove perjury, the State must present

> 1. The testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath; and
>
> 2. Another such direct witness or independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence.

*Olson,* at 136; *State v. Wallis,* 50 Wn.2d 350, 311 P.2d 659 (1957); *State v. Rutledge,* 37 Wash. 523, 79 P. 1123 (1905).

If an answer is literally, technically, or legally true, it cannot form the basis of a perjury charge. *State v. Olson, supra* at 137. Even an evasive answer intended to be misleading cannot constitute perjury if literally true. *Olson,* at 138; *Bronston v. United States,* 409 U.S. 352, 34 L. Ed. 2d 568, 93 S. Ct. 595 (1973). The court in *Olson,* at pages 139–40, quoted with approval *In re Rosoto,* 10 Cal. 3d 939, 949–50, 519 P.2d 1065, 112 Cal. Rptr. 641 (1974):

> It is thus apparent that when, as here, a witness' answers are literally true he may not be faulted for failing to volunteer more explicit information.

A *There was no provisions for equity.*
(Italics ours.)

Although such testimony may cause a misleading impression due to the failure of counsel to ask more specific questions, the witness' failure to volunteer testimony to avoid the misleading impression does not constitute perjury because the crucial element of falsity is not present in his testimony.

(Citations omitted.)

With these considerations in mind, we search the record for evidence directly contradictory of White's statement that "there was no provisions for equity" during the meeting on June 5. The relevant testimony of Violante in the civil[4] and criminal[5] trials is set out in the margin.

After searching the record, and keeping in mind that we

---

[4]Q How did you come in contact with Mr. White?
A *The first contact was by telephone.*
Q What was the essence of that contact?
A He asked if my house was still up for sale. I said yes, it was. He inquired as to the purchasing price. I told him. *He asked what the equity was, and I told him.* He asked for a general description of the house. Gave that to him, and he replied that he thought this was just about what he was looking for and if he could come out, take a look, which I said yes, he could.
Q Did you deviate, in telling Mr. White what your asking price was, from the advertised price?
A No, I did not.
Q What was the advertised price?
A Fifty–eight thousand five hundred, and I was allowing $1,000 in exchange for replacing some rugs.
Q *When did you first meet Mr. White?*
A *That same afternoon.* This is June 5th. He came out—would have been right after school—let's say approximately 2:30 to three o'clock.
Q What happened during your meeting?
A He looked at the house, said that he was very interested. He told me about him selling his restaurant and that he was looking for an assumption; that he was going to need to be moving out very soon because the place he was renting from, the people had come back two months early from Japan and were wanting to get back in their house, and so he was in the process of moving.
Q What restaurant was it that Mr. White was selling?
A Ben Paris Restaurant in Seattle.
Q When did he say the sale would be completed?
A It would close August 1st.
Q *Did you come to any agreement with Mr. White at that time?*
A *At that time, no.* I suggested that he bring his wife out and see how she liked the house.
Q Did that happen?

must view White's testimony "at line 20, page 112 of the report of proceedings" strictly in the context of the meeting

A Yes. They came out that evening. . . .
(Italics ours.)

Q Did you receive any response from a person who identified himself as Richard White?
A Yes. On June 5th I received a phone call from Mr. White, expressing interest in the ad. He inquired if the house was still available; I told him yes.
Q Now, where were you when you talked to Mr. White the first time?
A I was at the Bothell house.
Q All right. You talked to him on the telephone?
A Yes.
Q What time was it, do you remember?
A I would approximate 2:00.
Q 2:00 p.m.?
A In the afternoon, yes.
Q What did he say to you?
A He asked me a general description of the house, reaffirmed the buying price of the home, asked what—
Q What do you mean by reaffirmed? Tell the judge what was said.
A He asked what the price of the home was and I quoted the ad. He asked specifically what the balance was on the mortgage and I told him that.
Q Okay. Now, let's go through, in particular, how much did you tell Mr. White you were asking for the house?
A $58,500, and I was making allowance of $1,000 towards closing in lieu of the rugs.
Q What did you tell Mr. White insofar as the equity was concerned?
A I explained to him that I had two mortgages at $31,000, and was seeking the rest in equity that I wanted to close out.
Q How much did the two mortgages amount to?
A $31,000.
Q So basically you're talking $31,000 in mortgages and the difference between that and the $58,000 was what you considered to be your equity?
A Yes, I was estimating at that time about $27,000.
Q Now, what discussion did you have with Mr. White about that $27,000?
A He commented that this would be no problem as he had just sold his restaurant named Ben Paris, located in Seattle, and was going to receive $100,000 for the sale of that property.
Q Did you indicate at that time that you were willing to give away the difference between the $58,000 asking price and the $31,000 mortgage?
A No.
Q What, in particular, did you tell Mr. White you wanted in terms of your—in terms of the conditions of the sale? What did you want? What were the conditions in this sale?
A I wanted him to—he asked me if I was interested in an assumption and I

in person with Violante the afternoon of June 5, and not
with respect to prior telephone calls or subsequent promis-

said, "Certainly, if you could come up with that amount of cash," and
when he said that was no problem, I said, "I have no problem either. You
can assume my mortgages and pay me my equity and that would be fine."

Q When you say no problem, assuming you can come up with that amount of
cash, how much cash are you talking about?

A I was approximating around $27,000.

Q Now, did you use that figure in talking to Mr. White *on the telephone?*

A I'm sure I did because I've quoted that amount several times in the same
way on other inquiries.

Q All right. Were you asking for conventional financing or were you going to
carry a contract on this sale?

A No, I wanted a close-out. I wasn't interested in a contract.

Q All right, so what happened then after you went through—well, let me ask
you this. Did you discuss any other terms beyond the ones that we've just
talked about at that time?

A No.

Q Now, what did Mr. White do or say as you—

A He asked if the house would be available for seeing and that he was out in
the area and if he could come by, and I said that would be fine, and *he
then came out to the house, 2:30, 3:30, somewhere in that period of time.*

Q All right. Was he alone or with somebody?

A He had his young daughter with him.

Q This is still on June 5th now?

A Yes.

Q What happened when he arrived?

A He came out, introduced ourselves. I showed him the home. We walked
around the grounds and we were talking about the possible arrangements
for purchasing the house.

Q What did you show Mr. White when you showed him around the house?

A At that time it was just a general showing of the house.

Q The rooms and so forth, the property?

A The rooms downstairs, the grounds.

Q Okay, and did he seem pleased about that?

A Yes, he *was very interested in the house, commented that this was exactly*
what he was looking for. It was also in the school district that his children
were presently enrolled in and was very interested.

Q *Did you discuss terms at that time?*

A *Not specifically.* He again reiterated that he was selling his property at
Ben Paris and that he was going to be receiving a hundred thousand dol-
lars, which half would be his, as he was in a partnership.

Q After showing him around the property what did you do?

A I suggested that he bring his wife over in the evening and have her look at
the property, that I was interested in her being equally as pleased as he
was.

Q Why did you want her to look at the property?

sory notes, we conclude that Violante's testimony does not provide the positive, directly contradictory testimony required to support a perjury charge. White testified that no provision was made for equity. Violante testified, with respect to the critical meeting, that no agreement was reached and that he never told White he would let the house go with no provision for equity. The State failed to establish that provision for equity was made at that particular meeting, or that Violante's equity was even discussed, and thus failed to prove the falsity of White's testimony.

We recognize the inconsistencies between the stories of White and Violante, which could and did lead the court in the civil case to disbelieve White's version and enter judgment for Violante. These inconsistencies are not sufficient to sustain a charge of perjury.

The fact that Violante testified they discussed payment for the equity during the prior telephone conversation on June 5 does not contradict White's testimony that "there was no provisions for equity" at the later meeting. As the court stated in *Olson* at page 139:

> [P]erjury statutes are not to be loosely construed, nor are they to be invoked simply because a wily witness succeeds in derailing the questioner, so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of his inquiry. Precise questioning . . . is imperative as a predicate for perjury.

Because there was no testimony presented that directly and positively contradicted White's testimony as charged in the amended information, the conviction was based on

---

A To get her opinion to see that they were both in concurrence with wanting the house. He was very interested and saying that he wanted to buy it at that time.

Q *Now, during the 3:30 visit, did you ever tell Mr. White that you were willing to let the house go on a straight assumption with no provision for equity?*

A *No, at no time.*

Q Did you tell him you would when he initially called at 2:00?

A No.

(Italics ours.)

insufficient evidence. The conviction must be reversed[6] and the cause dismissed. *Burks v. United States,* 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978).

## THEFT CONVICTION

On April 10, 1980, in an unrelated matter, White was charged in King County with three counts of forgery, two counts of theft in the second degree, and one count of theft in the first degree. These charges arose out of alleged manipulations of bank accounts, and the cashing of forged checks by persons other than the defendant. During the course of the jury trial on these charges, White testified in his own defense and on cross–examination admitted that he had been convicted of perjury. The jury found White guilty of one count of second degree theft, and disagreed on the other five counts, which were subsequently dismissed by the State. White appeals the theft conviction, arguing that if the perjury conviction is reversed, introduction of that conviction at the King County trial was prejudicial error requiring reversal of the theft conviction as well.

The State argues that introduction of the perjury conviction for impeachment purposes prior to its reversal was valid under ER 609(a)(2).[7] White responds that use of a prior conviction for impeachment purposes is prejudicial error where the conviction is subsequently overturned on constitutional grounds, citing *Loper v. Beto,* 405 U.S. 473, 31 L. Ed. 2d 374, 92 S. Ct. 1014 (1972), which involved impeachment by conviction subsequently reversed on Sixth Amendment grounds.

---

[6]Because we reverse White's perjury conviction for lack of directly contradictory evidence, we need not reach White's contention that there was insufficient corroborating evidence as well.

[7]ER 609 provides:
"IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME
"(a) **General Rule.** For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross–examination but only if the crime . . . (2) involved dishonesty or false statement, regardless of the punishment."

In *State v. Murray,* 86 Wn.2d 165, 543 P.2d 332 (1975), the court distinguished *Loper,* which concerned convictions reversed on Sixth Amendment grounds, and refused to reverse a conviction where the defendant had been impeached by a prior conviction which was subsequently reversed because of invalidity under the Fourth Amendment. The court in *Murray* drew a distinction between those constitutional violations which render the fact–finding process inherently unreliable, such as denial of the right to counsel, and those which do not so impair the validity of fact finding, such as those concerning an unconstitutional search or seizure. *Murray,* at 167–68; *United States v. Penta,* 475 F.2d 92 (1st Cir.), *cert. denied,* 414 U.S. 870, 38 L. Ed. 2d 88, 94 S. Ct. 89 (1973).

■ The case before us falls into the same category as *Loper.* White's perjury conviction has been reversed because of insufficiency of the evidence, a constitutional defect of the highest magnitude. White has the right, under the due process clause of the Fourteenth Amendment, to be convicted only on evidence sufficient beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980); *Jackson v. Virginia,* 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Violation of this right subverts the fact–finding process, and a conviction obtained on insufficient evidence should have no probative value whatsoever for purposes of impeachment in a subsequent trial for another offense.

■ The State argues that the error in this case was harmless. A review of the record reveals sufficient evidence from which the jury could have inferred guilt without knowing of the tainted conviction. It is far from certain, however, that they *would* have so inferred. We cannot divine what weight the jury must have given to the perjury conviction in deciding whether to believe White's testimony, but we intuit that a conviction for perjury would have a great adverse effect. It is impossible to predict what their response would have been had the conviction not been

introduced.

When the appellate court is unable to say from the record whether the defendant would or would not have been convicted but for the error, then the error may not be deemed harmless. *State v. Martin*, 73 Wn.2d 616, 440 P.2d 429 (1968). A harmless error is

> an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.

*State v. Britton*, 27 Wn.2d 336, 341, 178 P.2d 341 (1947); *State v. Oswalt*, 62 Wn.2d 118, 381 P.2d 617 (1963). In *Oswalt*, the court reversed a conviction because the defendant's alibi witness had been impeached on a collateral matter. The court stated

> The defense apparently rested upon alibi. The state seemingly considered the testimony of witness Ardiss sufficiently credible to require this attack. The defendant was convicted. It is difficult, therefore, to classify admission of the testimony in question trivial, formal, academic, or harmless, and to conclude that such did not affect the outcome of the case. The alternative is that it was prejudicial. We so hold.

*Oswalt*, at 122–23. The same standard controls here.

White is entitled to a new trial at which his testimony is not sterilized by a prior conviction which was void in the first place. The judgment for perjury is reversed and the cause is dismissed. The theft judgment and sentence is reversed and the cause remanded for a new trial.

DURHAM, A.C.J., concurs.

WILLIAMS, J. (dissenting)—White's sworn statement "There was no provision for equity" must be taken in the full context of the civil case, not on the selective basis employed by the majority. Violante brought the civil action to quiet title and recover possession of his residential property from White, receiving judgment sustaining him on all grounds. *Violante v. White*, 26 Wn. App. 391, 612 P.2d 828

(1980). From the very first, White schemed to acquire Violante's $58,500 house by assuming the mortgage indebtedness of $31,000, paying Violante no money. Through resort to devious methods of which the statutory deed and promissory note are part, White did get title and possession of the property. When he testified that there was no provision for equity in the sale agreement, he was attempting to deceive the trial court upon *the central issue in the case.* This is seen when we know what happened before, at the time and after the statement was made, not in isolation as the majority would have it.

The initial contact came when White called Violante on the telephone in answer to Violante's newspaper ad listing the house for sale for $58,500. The time is 2 p.m. on June 5, 1978. The versions of the telephone call are:

By VIOLANTE:

Q How did you come in contact with Mr. White?
A The first contact was by telephone.
Q What was the essence of that contact?
A He asked if my house was still up for sale. I said yes, it was. He inquired as to the purchasing price. I told him. He asked what the equity was, and I told him. He asked for a general description of the house. Gave that to him, and he replied that he thought this was just about what he was looking for and if he could come out, take a look, which I said yes, he could.
Q Did you deviate, in telling Mr. White what

By WHITE:

Q And how was that contact made?
A It was also through an ad in the paper. I called Mr. Violante and I explained to him what I was trying to do, and he says, "Well, come on over to the house, we can work something out." . . .
Q Now, you indicated you expressed to Mr. Violante what you wanted to do. Would you be a little more definite for us?
A I was looking for something I could assume with no money.
Q And what was his response to that?
A His response was, "We can work something out.

your asking price was, from the advertised price?

A No, I did not.

Q What was the advertised price?

A Fifty–eight thousand five hundred . . .

Exhibit 1, at 10–11.

Q [H]ow much did you tell Mr. White you were asking for the house?

A $58,500, . . .

Q What did you tell Mr. White insofar as the equity was concerned?

A I explained to him that I had two mortgages at $31,000, and was seeking the rest in equity that I wanted to close out.

. . .

Q So basically you're talking $31,000 in mortgages and the difference between that and the $58,000 was what you considered to be your equity?

A Yes, I was estimating at that time about $27,000.

Q Now, what discussion did you have with Mr. White about that $27,000?

A He commented that this would be no problem as he had just sold his restaurant named Ben Paris, located in Seattle, and was going to receive $100,000 for the sale of that property.

Q Did you indicate at that time that you were willing to give away the difference between the $58,000 asking Come over and see the house."

Verbatim Report of Proceedings, at 144–45.

price and the $31,000 mortgage?

A No.

Verbatim Report of Proceedings, at 36–37.

Within a few minutes White went to see the house. Present were White, Violante and his daughter. The time, 2:30 p.m., June 5, 1978.

By VIOLANTE:

Q What happened when he arrived?

A He came out, introduced ourselves. I showed him the home. We walked around the grounds and we were talking about the possible arrangements for purchasing the house.

. . .

Q Did you discuss terms at that time?

A Not specifically. He again reiterated that he was selling his property at Ben Paris and that he was going to be receiving a hundred thousand dollars, which half would be his, as he was in a partnership.

. . .

Q Now, during the 3:30 visit, did you ever tell Mr. White that you were will-ing to let the house go on a straight assumption with no provision for equity?

A No, at no time.

Q Did you tell him you would when he initially called at 2:00?

A No.

By WHITE:

Q What was the conversa-tion that you had about the price of the house?

A I explained to him that I was looking for some-thing with a no cash outlay and I wanted something that—just to assume, and he at that time described the fact that there was two mort-gages on the house and was that going to create any problem, and I told him—I told him no, that I was interested more in terms than what the payments were—you know, terms meaning the amount of cash to get in.

Q What did he tell you it would cost you to get in?

A He told me that if I could assume the two mort-gages, that we could go that route. He was con-cerned that one mortgage would not be assumable.

Q It's not unusual to assume a mortgage. However, when you're buying a house with a substantial equity, there has to be

Verbatim Report of Proceedings, at 38–39.

some provision made for the equity purchase. What was the deal in regard to that? . . .

A There was no provisions for equity.

Q Was it just not raised or was it: "I'll give you this house if you'll just take over the payments on the mortgage"?

A That's what it was.

Q And that's what Mr. Violante told you.

A Right. This was what the discussion was.

Exhibit 1, at 111–13.

By VIOLANTE'S DAUGHTER:

Q Did you hear any discussions between your father and Mr. White about the Ben Paris Restaurant?

A Yeah.

Q Do you recall what those discussions were?

A Well, he had said that he was selling his restaurant and needed to get out of his house and he was in the middle of money right now—you know, that he was waiting for the money from his restaurant, but he needed to get out of his house.

Exhibit 1, at 134.

That evening, White and his wife came to the house. Present were the Whites, Violante and a friend, Lynne Alexander. The time, 7 p.m., June 5, 1978.

By VIOLANTE: By WHITE:

Q [T]ell the judge in particular what discussions you had about

the selling price, what you expected.

A Again we went into depth now on my expectations, reiterated essentially the advertisement. I discussed with him that I had two mortgages which constituted the $31,000, as I had taken a second mortgage out on the house. We discussed the expectations of the equity I had built up in the home. I spent a great deal of time asking Mr. White about his business, about receiving the amount of money.

. . .

Q All right, so in terms of figures, you've already told us that the advertised price was $58,500, and you had two mortgages for $31,000 and that you expected to be paid cash for the difference.

A Yes.

. . .

Q What was he saying to you about your terms?

A That that would fit into the amount of money that he was receiving from the sale of his restaurant, that that would not be a problem. . . .

Q All right. Who was present when these negotiations were going on?

A Lynne Alexander, Mr. White, Mrs. White and myself.

Verbatim Report of Proceedings, at 42–44.

By Miss ALEXANDER:

Q All right. Would you tell the Court what negotiations you heard?

A Well, there was, you know, discussion of the amount that

Mr. White was to pay. It was
$28,000, which he said that
he had—this was mostly with
Jim, that he was, you know,
selling a restaurant that he
was owner of, . . .

Q Did Mr. White tell you how
much he was going to get for the
sale of the Ben Paris restaurant?

A Yes, he said that the sale
would—what do you call it,
the profit, would be $100,000 and
his share would be $50,000.

Q Did Mr. White tell you what he
was going to do with his share?

A Well, after he paid the money
for the house, then he also
had plans for putting in a
swimming pool and finishing
the basement, which was not
finished at that time.

Q Now—

A He said he wanted to get rid
of all his money from the sale
for tax purposes.

Q Now, did you ever hear Mr.
White tell Mr. Violante speci-
fically how much cash he was
going to give him?

A $28,000.

Verbatim Report of Proceedings,
at 123–24.

The remainder of the record in both Violante's civil case
against White to recover the property and the State's crim-
inal case against White for perjury show Violante gullible
and honest and White clever and dishonest.

The next day, June 6, White offered to and did prepare a
warranty deed, tax statement and a promissory note for
$28,000. On June 7, the two met at a notary and signed·
these documents; Violante kept the deed and tax state-
ment, White kept the promissory note. During the day
Violante became apprehensive, sought a friend's advice and

prepared a real estate contract calling for the $28,000 cash payment for equity. That evening the two met at Violante's request to review the contract. All of the documents except the promissory note, which White had "voided", were on the table. White agreed to the contract, signed it and took it home with him. After White left, Violante gathered up the papers—the warranty deed was gone! On June 9 White recorded the deed without Violante's knowledge and took possession of the house on the promise that he would pay $422 per month until the equity was paid in August from the Ben Paris sale. He paid neither the rent nor the equity and the civil action followed.

The majority erroneously puts White's statement in a vacuum; it must be viewed in the context of all the events. White's statement that "There was no provision for equity" is clearly false and self-serving. It was not literally, technically nor legally true. White tried, all along, to convince the court that there never had been a provision for equity. His statement, framed in the past tense, was made in furtherance of his goal to show they *never* discussed equity; it was not made in the narrow context to show that they did not discuss equity at the afternoon meeting. Violante's testimony exposes White's fabrication and directly contradicts White's statement under oath.

Because the perjury conviction is valid, I believe that the theft conviction should also be affirmed.