# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                                    )     No. 70147-9-I

           Respondent, )
                                    )     DIVISION ONE

         v. )
                                      )     UNPUBLISHED OPINION

MARK CURTIS HUDSON, )
                                      )

           Appellant. )     FILED: December 29, 2014

TRICKEY, J. — Mark Hudson appeals his convictions for attempting to elude, domestic violence misdemeanor violations of a court order, and residential burglary. He raises several arguments, one of which challenges the trial court's admission of a subsequently reversed conviction for witness tampering. Following the United States Supreme Court's decision in Loper v. Beto, 405 U.S. 473, 92 S. Ct. 1014, 31 L. Ed. 2d 374 (1972) and our decision in State v. White, 31 Wn. App. 655, 644 P.2d 693 (1982), we reverse Hudson's convictions, holding that the erroneous admission of Hudson's witness tampering conviction was not harmless error, and remand for retrial.

## FACTS

Mark and Rebecca Hudson[1] had been married for over 13 years. They have three children together. At some point in 2010, Hudson became unemployed and his relationship with Rebecca began to deteriorate.

Previous Charges against Hudson

In September 2010, Hudson allegedly attacked Rebecca with a knife. Rebecca called the police. The State charged Hudson with felony assault and felony harassment.

---

[1] We refer to Rebecca Hudson by her first name when appropriate for ease of reference. We mean no disrespect.

State v. Hudson, noted at 179 Wn. App. 1002, 2014 WL 231925, at *1. The trial court entered a no-contact order prohibiting Hudson from contacting Rebecca.

From jail, while awaiting trial, Hudson made several telephone calls to Rebecca's telephone number. Hudson, 2014 WL 231925, at *1. During one call, Hudson asked the woman who answered to tell the prosecutor that the woman had relocated, and instructed her to refrain from answering telephone calls or responding to e-mails. Hudson, 2014 WL 231925, at *1. According to Rebecca, as a result of Hudson's urging, she did not show up in court to testify against Hudson. The trial court dismissed the charges without prejudice because Rebecca was unavailable to testify as a witness. Hudson, 2014 WL 231925, at *1.

In April 2012, the State charged Hudson by amended information with tampering with a witness, domestic violence misdemeanor violation of a court order, and second degree assault. Hudson, 2014 WL 231925, at *1. The assault charge was the same alleged assault that took place in September 2010. The other charges were also for acts occurring in 2010. Rebecca appeared as a witness at that trial, but gave false testimony. Hudson, 2014 WL 231925, at *1-2. Hudson had coached Rebecca on her testimony and she testified accordingly. The jury convicted Hudson of witness tampering and violation of a court order. Hudson, 2014 WL 231925, at *2.

Charges in Present Case

On April 27, 2012, the trial court entered another protection order, identifying Rebecca as the protected party.

Rebecca testified that on May 29, 2012, she and Hudson were living together. This formed the basis for count III, domestic violence misdemeanor violation of the April 2012 no-contact order.

2

Hudson was incarcerated from May 29, 2012 until June 17, 2012. Rebecca testified that on June 17, 2012, the day Hudson was released, she drove to the airport to pick him up. The State charged this act as count IV, domestic violence misdemeanor violation of the April 2012 no-contact order.

According to Rebecca's testimony, later that day, Hudson accused her of changing her passwords to all of her financial and personal accounts. Rebecca testified that Hudson struck her on the head, pushed her on the bed, pinned her down with his knees, and struck her again. Rebecca testified that she made a comment that further angered him, and he obtained a belt and tried to place it around her neck. Shortly after this incident, according to Rebecca, she observed redness on her neck and shoulders, and her ear began to ring. The alleged act of domestic violence this day was the basis for count I, domestic violence felony violation of the April 2012 no-contact order.

The next day, on June 18, Rebecca notified her sister about Hudson's purported act of domestic violence on the previous day. Rebecca's sister then called the police, requesting that they perform a welfare check on Rebecca.

On June 19, 2012, Seattle Police Officer Todd Jones and his partner drove to Rebecca's residence on Bangor Street. Officer Jones observed a green BMW car parked in the driveway. He discovered that the license plate was registered to Hudson. Officer Jones also learned of the existence of the April 2012 no-contact order.

The officers then knocked on the front door. Hudson answered the door and identified himself. Officer Jones asked if Rebecca was inside the house. Hudson responded that she was not inside and that he had not seen her. Officer Jones returned to his car, viewed a photograph of Hudson, and confirmed that Hudson was the man with whom he had just spoken.

3

Later that morning, Officer Jones called Rebecca. After speaking with her, he returned to her residence on Bangor Street to arrest Hudson for felony violation of a no-contact order. When Officer Jones arrived at the residence for the second time, the BMW was no longer there and no one answered the door. Officer Jones contacted Rebecca, who told him that she was walking toward her house. Officer Jones soon located Rebecca on a street close to her house. As he approached Rebecca, he observed Hudson's green BMW driving toward him in the opposite lane of travel.

As the BMW passed him, Officer Jones saw Hudson driving the vehicle and noticed the license plate matched the same one he had previously identified. Officer Jones testified that as he passed Hudson, he was unable to determine whether anyone else was riding in the car with him. Rebecca also was unable to see who else was in the car.

Officer Jones made a U-turn and signaled his lights and siren for Hudson to stop. Traveling at a high rate of speed, Hudson ran a stop sign, pulled into the oncoming lane of traffic, and sped away. Officer Jones lost sight of Hudson's vehicle. On these facts, the State charged Hudson with count II, attempting to elude a pursuing police vehicle. A video of the pursuit was admitted into evidence and played for the jury at trial.

Officer Jones drove back to meet with Rebecca. When he approached her, she was speaking on her cellular telephone with Hudson. Rebecca told Officer Jones that their three-year-old daughter was in the car with Hudson. The State charged this fact as an enhancement to count II.

Officer Jones escorted Rebecca to her residence. Rebecca provided a statement to the officers. Throughout the interview, Rebeca's cell phone rang approximately eight

times. Officer Jones testified that he saw Hudson's name appear on Rebecca's cell phone when it rang. At trial, Rebecca confirmed that it was Hudson who was calling her.

Officer Jones noticed, and took photographs of, the swelling and redness on Rebecca's face. Rebecca also reported to Officer Jones that she had pain and bruising in her upper chest area. She told Officer Jones that Hudson had assaulted her on June 17. The photographs were later admitted as evidence at trial.

After Rebecca gave Officer Jones her statement, one of the officers drove Rebecca to a shopping mall. Rebecca then called Hudson to pick her up. While in the car, Hudson told Rebecca that they could not return to their residence, so he drove Rebecca to a motel. Later that evening, Hudson drove Rebecca to the hospital where she worked. He took Rebecca's keys to her house and the debit card to Rebecca's individual account. They arranged to have Hudson pick Rebecca up from the hospital when she finished working. Subsequently, during Rebecca's shift, Hudson sent her a text message indicating he was at the hospital. Rebecca called 911.

Deputy Chris Pelczar responded to Rebecca's call and arrived at the hospital at approximately 11:30 p.m. Deputy Mary Syson spoke with Rebecca, learned that Hudson had contacted her and was present at the hospital, and confirmed the existence of the no-contact order. Deputy Pelczar arrested Hudson. The acts that day formed the basis for count V, domestic violence misdemeanor violation of the April 2012 court order.

On June 22, 2012, the State filed its initial information in the present case, charging Hudson with counts I through V, as described above.

On July 3, 2012, the superior court issued another domestic violence no-contact order against Hudson, naming Rebecca as the protected party.

On July 9, 2012, Hudson's mother posted $500,000 cash bail and Hudson was released from jail.

Police officers installed a surveillance camera at the Bangor Street residence, where Rebecca was living, showing the front driveway and front door of the residence. The camera enabled the officers to view events as they occurred.

On August 14, 2012, Officer Christopher Johnson was watching the surveillance video from his office and noticed a motor scooter parked in the driveway where Rebecca usually parked her car. Officer Johnson discovered that the license plate was registered to Hudson. While viewing the screen, he saw Hudson dismount from the motor scooter and enter the residence through the front door. Officer Johnson alerted an on-duty deputy to park his patrol car near the house and stop the motor scooter. While en route to the residence, Officer Johnson was able to continue watching the live surveilled scene from his laptop computer. He saw Hudson emerge from the house and walk toward the motor scooter. Officer Johnson later made a screen print of the video, which was admitted as an exhibit at trial. The video footage of Hudson's entrance and exit of the residence was also admitted and played for the jury at trial.

Soon another deputy stopped the motor scooter and Hudson was identified as the individual on the vehicle. Hudson was detained approximately one quarter-mile from the Bangor Street residence.

From the incidents that day, August 14, 2012, the State by second amended information added count VI, residential burglary, and count VII, domestic violence misdemeanor violation of the July 2012 court order.

At the time of trial, Hudson's 2012 witness tampering conviction was pending appeal.

Over the course of the eight day trial, numerous witnesses testified, including Rebecca, Hudson, Officer Jones, Deputy Pelczar, Deputy Syson, Officer Johnson, and Hudson's mother.

The jury found Hudson guilty of attempting to elude (count II), violation of a court order (counts V and VII), and residential burglary (count VI). The jury found a domestic violence aggravating factor for count VI, and a rapid recidivism aggravating factor for count II.

The jury acquitted Hudson of count III and did not reach verdicts on counts I and IV, which the State dismissed at sentencing.

On January 21, 2014, we reversed and dismissed Hudson's 2012 witness tampering conviction on the basis that insufficient evidence supported the conviction. Hudson, 2014 WL 231925, at *5.

Hudson appeals.

## ANALYSIS

Hudson first contends that his convictions should be reversed because, he argues, the trial court erroneously permitted the State to impeach him with evidence of his witness tampering conviction, which was pending appeal at the time of trial and later reversed. The State concedes that the admission of the prior conviction was erroneous in light of its subsequent reversal. It argues, however, that reversal is not warranted because the introduction of the evidence was harmless. We find that the admission of Hudson's witness tampering conviction was not harmless error and, accordingly, reverse his convictions.

Prior to trial, the trial court granted the State's motion in limine to admit Hudson's witness tampering conviction under ER 609 to impeach Hudson.

The State also moved in limine to admit, under ER 404(b), prior acts of domestic violence that had occurred in the previous two years. The State argued that the evidence was relevant to allow the jury to assess Rebecca's credibility in the event that Hudson introduced evidence of Rebecca's recantation and false testimony in Hudson's prior two criminal cases. The trial court agreed with the State's arguments and granted the State's ER 404(b) motion.

Evidence of Hudson's witness tampering pervaded the trial—as did evidence of the State's 2010 and 2012 criminal charges against Hudson and the outcomes of those cases—and was presented by both Hudson's defense counsel and the prosecutor. Defense counsel was the first party to introduce evidence of Hudson's witness tampering conviction during Hudson's direct examination:

Q. So, Mr. Hudson, there's -- there's, I think, two separate incidences?
A. Correct.
Q. One that was dismissed and then one more recently?
A. Yes, this is tampering with a witness, although that case was dismissed back in 2010, not the tampering with the witness, but the case beforehand, they just reach back.
      And, I mean, you guys heard the call. Is that tampering with a witness, the call that you heard?
Q. So that's all out of the same incident; is that what you're saying?

. . . .

A. Well, the tampering with the witness -- well, yes, we were trying to figure out, you know, exactly when the call -- I mean, we were trying to show you that that was basically in the past.
      But, fortunately, she just said that she signed the disk yesterday or on the 13th or whatever, but that call was from the past.
Q. You know, there was a -- you had a trial here in -- I think it was April of this year (sic)?
A. Correct. There was a trial of -- in April in which I was found guilty of tampering with a witness and breaking the no-contact order.

. . . .

Q. Now, you did some jail time on that case; is that right? You were convicted of tampering --

A.  Correct, correct.[2]

Hudson brought up the witness tampering conviction again during direct examination when he testified, "The thing with the Bangor address, on April 27th, when I was convicted, when I was convicted of this tampering with a witness . . ., I basically rented the Bangor address to be somewhere close to my kids."[3]

Then, during cross-examination of Hudson, the prosecutor referred to the conviction:

Q.  . . . You talked a little bit yesterday about the fact that you were convicted of tampering with a witness?
A.  Correct, yes.
Q.  You were talking about that involved, yesterday you testified it involved Rebecca Hudson?
A.  Tampering with the witness?  Yes.
Q.  And that was related to the last, I think you testified that it was related to the last incident with her?
A.  It was related to, well, yes.  The reason why I am here is because it was related to that, yes.[4]

During redirect examination, while describing the outcomes of the 2010 and 2012 cases, Hudson reiterated that he had been convicted of witness tampering.  Hudson explained that Rebecca had testified untruthfully in the 2012 witness tampering case.  Hudson again testified that he had been convicted of tampering with a witness, as well as violating a no-contact order.

During re-cross examination of Hudson, the prosecutor brought up the witness tampering conviction in reference to a telephone call Hudson made to Rebecca while he was in jail in 2010; the call had been introduced in the 2012 trial to prove witness tampering.  The prosecutor went on to ask about the September 2010 case where Hudson

---

[2] 8 Report of Proceedings (RP) (Jan. 8, 2013) at 114-16.
[3] 8 RP at 121.
[4] 9 RP (Jan. 9, 2013) at 82.

9

was charged with assault. Then, the prosecutor had Hudson read two of the charges from the State's information from the 2012 witness tampering case. The following exchange ensued:

Q.    ... Count I refers to?
A.    Tampering with a witness.
Q.    That is the one we have been talking about, correct?
A.    We have been talking about three different cases.
Q.    That is the one we have been talking about, that phone call. That phone call, you say, is from that case?
A.    I am saying the phone call that you heard. This, I have on appeal.
Q.    Mr. Hudson, that is not the question.
A.    This is currently on appeal.[5]

The prosecutor moved to strike Hudson's comment that the case was on appeal, and the trial court granted the prosecutor's request. The prosecutor then spent considerable time discussing with Hudson the charges from the previous cases and their results. The witness tampering charge came up on several occasions in that discussion.

The final instance in which the prior witness tampering conviction was spoken of was during Officer Johnson's testimony. Officer Johnson testified he had been the assigned case detective in the 2012 witness tampering case.

A trial court may admit evidence of a witness's prior conviction if the crime involves dishonesty. ER 609(a)(2). In Washington, witness tampering is considered to be a crime of dishonesty. State v. Bankston, 99 Wn. App. 266, 269-70, 992 P.2d 1041 (2000). A prior conviction is not rendered inadmissible while on appeal, but "[e]vidence of the pendency of an appeal is admissible." ER 609(e).

The issue concerning the admissibility of the prior conviction may arise later, however, if and when the prior conviction is reversed. The reviewing court must consider whether the constitutional error in the prior conviction rendered the fact-finding process

---

[5] 9 RP at 116.

in that prior case inherently unreliable. See State v. Murray, 86 Wn.2d 165, 167-68, 543 P.2d 332 (1975). If so, the court must decide whether it was highly likely that admission of that unconstitutionally obtained prior conviction influenced the outcome of the present case such that it deprived the defendant of due process. Loper v. Beto, 405 U.S. 473, 480, 92 S. Ct. 1014, 31 L. Ed. 2d 374 (1972).

In Loper, the State charged the defendant with statutory rape of a child. The only witnesses were the defendant and the child. The State impeached the defendant with four prior convictions. The jury found the defendant guilty. Loper, 405 U.S. at 474-75. The defendant later filed a petition for habeas corpus, arguing that the previous four convictions were constitutionally invalid because he had been denied the assistance of counsel, contrary to the Supreme Court's holding in Gideon v. Wainright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). Loper, 405 U.S. at 476. The Supreme Court held that "the use of prior, void convictions for impeachment purposes deprive[s] a criminal defendant of due process of law where their use might well have influenced the outcome of the case." Loper, 405 U.S. at 480. The Court noted that defendant's conviction at trial was entirely dependent on whether the jury believed the defendant's testimony or the child's testimony. Loper, 405 U.S. at 482. The convictions were used solely to destroy the defendant's credibility. Loper, 405 U.S. at 482.

In State v. White, the State introduced at trial a prior conviction that was subsequently invalidated for insufficient evidence. 31 Wn. App. 655, 665-66, 644 P.2d 693 (1982). We held that insufficient evidence is a "constitutional defect of the highest magnitude," that disrupted the fact-finding process, as did the constitutional infirmity in Loper. White, 31 Wn. App. at 666. We reasoned that the due process clause of the Fourteenth Amendment requires a conviction to be supported by evidence beyond a

reasonable doubt. White, 31 Wn. App. at 666 (citing State v. Green, 94 Wn.2d 216, 616 P.2d 628 (1980); Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); In re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). We then determined that the introduction of the reversed conviction was not harmless error:

> A review of the record reveals sufficient evidence from which the jury could have inferred guilt without knowing of the tainted conviction. It is far from certain, however, that they would have so inferred. We cannot divine what weight the jury must have given to the perjury conviction in deciding whether to believe White's testimony, but we intuit that a conviction for perjury would have a great adverse effect. It is impossible to predict what their response would have been had the conviction not been introduced.

White, 31 Wn. App. at 666-67 (emphasis omitted). Because we were unable to determine whether the defendant would or would not have been convicted but for the error, we concluded the error was not harmless. See White, 31 Wn. App. at 667 (citing State v. Martin, 73 Wn.2d 616, 440 P.2d 429 (1968)).

Here, the State erred by introducing evidence of Hudson's witness tampering conviction that was later reversed for insufficient evidence. The constitutional error went to the integrity of the fact-finding process. See White, 31 Wn. App. at 666. The State concedes the error. The question becomes whether the error is reversible error—i.e., whether it affected the outcome of the case such that Hudson was deprived his right to due process.

As in White, it is difficult to conclude if and to what degree the jury gave weight to the tampering conviction or whether, but for its admission, the jury would have acquitted Hudson of the four charges for which he was convicted. Both parties referred extensively to Hudson's tampering conviction and other criminal history in the preceding two years as part of an effort to impeach Rebecca's and Hudson's credibility. Hudson and Rebecca were the only eyewitnesses to attest to three of the alleged crimes as charged in counts

I, III, and IV. Notably, the jury did not convict Hudson of these three charges. On the other hand, the charges on which the jury convicted Hudson did not rely solely on Hudson's and Rebecca's testimony because they were corroborated by police officers' testimony, and some by video surveillance footage and photographs.

Nevertheless, Hudson's credibility was at issue on every charge. Thus, as in White, sufficient evidence would have allowed the jury to find Hudson guilty of the charges on which he was convicted even absent its knowledge of the witness tampering conviction. See White, 31 Wn. App. at 666. But, again as in White, we cannot say with certainty that the jury would have necessarily inferred guilt on those charges because those charges also required the jury to assess Hudson's credibility. See White, 31 Wn. App. at 666. To hold that the jury did or did not give considerable weight to the witness tampering conviction would require us to indulge in conjecture and speculation. Because we cannot say with certainty whether Hudson would have been convicted but for the erroneous introduction of the conviction, we conclude that the error was not harmless.

The State argues that the error was harmless because the evidence underlying Hudson's conviction was independently and properly admitted under ER 404(b). While this may be true, it does not alter our conclusion that the admission of the evidence of the prior conviction itself was reversible error. The fact of Hudson's prior conviction was presented numerous times during trial, and the jury ultimately convicted Hudson of four out of seven charges against him. In view of the uncertainty surrounding the impact of the admission of the witness tampering conviction, we find that the error was not harmless. We reverse Hudson's convictions and remand for new trial.

Hudson next contends that the trial court violated his constitutional right to a unanimous jury verdict by failing to give a unanimity instruction for count V, the no-contact

order violation charge occurring on June 19. He argues that the State presented evidence of multiple acts that could have violated the court order on June 19. We agree.

We review alleged instructional errors de novo. State v. Sibert, 168 Wn.2d 306, 311, 230 P.3d 142 (2010). "Criminal defendants in Washington have a right to a unanimous jury verdict." State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994) (citing Const. art. I, § 21). When the State presents evidence of several acts that could constitute the crime charged, the jury must unanimously agree on which act constituted the crime. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). To ensure jury unanimity, the State must either elect the act on which it relies, or the court must instruct the jury to unanimously agree that at least one particular act constituting the charged crime has been proved beyond a reasonable doubt. Kitchen, 110 Wn.2d at 411; see also State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). An instruction must be given when the State does not elect a specific criminal act. State v. Gitchel, 41 Wn. App. 820, 822, 706 P.2d 1091 (1985). "When the State fails to make a proper election and the trial court fails to instruct the jury on unanimity, there is constitutional error." Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

The State concedes that it presented multiple acts that could have constituted the crime of a violation of a no-contact order.[6] The State responds, however, that because the prosecutor indicated to the jury during closing argument that count V was premised on Hudson's act of going to Rebecca's place of employment, no unanimity instruction was required. During closing argument, the prosecutor stated:

> Count five, violation of a court order. This occurs on June 19th, 2012, when Mark goes up to Rebecca's hospital where she works, again, in violation of

---

[6] The State does not argue that the acts that day established a continuing course of conduct. See Petrich, 101 Wn.2d at 571 (No election or jury instruction is required if the evidence establishes a "continuing course of conduct.").

14

the no-contact order, goes to pick her up from work that night after they had their communique.[7]

When determining whether the State made an election of a specific act, courts consider several factors, including the charging document, evidence presented, jury instructions, and closing argument. State v. Kier, 164 Wn.2d 798, 813-14, 194 P.3d 212 (2008). A prosecutor's statement in closing argument is not a "clear election" when the evidence and jury instructions indicate that multiple acts constitute the crime charged. Kier, 164 Wn.2d at 813.

Here, the "to convict" instructions required the jury to find beyond a reasonable doubt that, among other things, on June 19, 2012, Hudson "knowingly violated a provision of [a no-contact] order."[8] The State presented evidence of several acts on June 19 on which the jury could have convicted Hudson for violation of the no-contact order: entering Rebecca's residence in the morning; driving within 1,000 feet of Rebecca on the street; talking to Rebecca on the telephone; telephoning her repeatedly while she was being interviewed; texting her later that evening; and coming within 1,000 feet of her workplace. In addition, the second amended information did not identify the specific act on which the alleged crime was based. And the trial court did not give a jury unanimity instruction on the crime of violation of a court order as charged in count V. Thus, in light of the charging document, the evidence presented at trial, and the jury instructions, we find that the prosecutor's statement in closing argument did not amount to a clear election.

Because neither an election nor a jury instruction was made, the conviction was constitutional error. Reversal is required unless the court determines that the error is harmless beyond a reasonable doubt. State v. Coleman, 159 Wn.2d 509, 512, 150 P.3d

---

[7] 11 RP (Jan. 14, 2013) at 9-10.
[8] Clerk's Papers (CP) at 73.

1126 (2007). But because we reverse Hudson's convictions and remand for erroneously admitting the witness tampering conviction, we need not determine whether the error here constituted harmless error. Nevertheless, the trial court on remand should give a jury unanimity instruction on the no-contact order violation charge occurring on June 19, as charged in count V.

Hudson next challenges the jury instructions involving the no-contact order violations. Essentially, he contends that the orders' provisions—proscribing him from keeping Rebecca under surveillance or coming within 1,000 feet of her—are not identified as criminal conduct under RCW 26.50.110(1). Hudson asserts, therefore, that the jury instructions improperly permitted the jury to convict him for actions not criminal.

Hudson did not object to the jury instruction at trial. A reviewing court is not required to review errors not raised in the trial court. RAP 2.5(a). An exception to this general rule exists when the claimed error is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Under the exception, an appellant must demonstrate that (1) the error is manifest and (2) the error is truly of constitutional dimension. State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "Instructional errors do not automatically constitute manifest constitutional error." State v. Guzman Nunez, 160 Wn. App. 150, 163, 248 P.3d 103 (2011). Our Supreme Court has specified several instructional errors that are of constitutional magnitude, including instructions that direct a verdict, shift the burden of proof to the defendant, fail to define the "beyond a reasonable doubt" standard, fail to require a unanimous verdict, and omit an element of the crime charged. O'Hara, 167 Wn.2d at 100-01. These errors "affect a defendant's constitutional rights by violating an explicit constitutional provision or denying the defendant a fair trial through a complete verdict." O'Hara, 167 Wn.2d at 103. Hudson has failed to establish that the alleged

instructional error implicates a constitutional interest. Accordingly, we decline to review this contention for the first time on appeal.

Furthermore, to the extent Hudson is challenging the validity of the no-contact orders, he is collaterally barred from doing so unless he shows that the orders are void. City of Seattle v. May, 171 Wn.2d 847, 852, 256 P.3d 1161 (2011) (concluding that the collateral bar rule prohibits a defendant from collaterally attacking the validity of a domestic violence protection order in a subsequent prosecution for violation of that order, unless the defendant can show that the order is void).[9]

We hold that the erroneous admission of Hudson's subsequently reversed conviction was not harmless error and, therefore, reverse all of his convictions and remand for retrial consistent with this opinion.

Trickey J.

WE CONCUR:

_____ 

Becker, J.

---

[9] Hudson raises additional contentions on appeal. Because we reverse Hudson's conviction and sentence and remand for retrial on another ground, we need not address those arguments here.